WOODMAN v KERA, LLC

Docket Nos. 275079 and 275882. Submitted June 10, 2008, at Grand
    Rapids. Decided August 12, 2008, at 9:00 a.m. Leave to appeal
    sought.

    Trent Woodman, a minor, through his mother and next friend, Sheila
    Woodman, brought an action in the Kent Circuit Court against Kera,
    L.L.C., which operates a facility that contains large, inflatable play
    equipment, seeking damages for injuries he sustained when he
    jumped from a slide during a birthday party held for him at the
    defendant's facility, which had been rented for that purpose by Sheila
    Woodman. The plaintiff alleged negligence, gross negligence, and
    violation of the Michigan Consumer Protection Act (MCPA), MCL
    445.901 *et seq.* The defendant moved for summary disposition,
    arguing that the plaintiff's father signed a valid release before the
    party on behalf of the plaintiff and waived all of the plaintiff's
    potential claims against the defendant. The defendant further
    claimed that the plaintiff could not prove gross negligence but, if he
    could, liability was precluded because the danger of jumping from the
    slide constituted an open and obvious hazard. The defendant also
    asserted that it had no duty to supervise the plaintiff because his
    parents were with him at the time of the accident. Finally, the
    defendant sought dismissal of the MCPA claim, alleging that it did
    not make any misrepresentations and that the allegations in the
    complaint do not comprise the type of case the MCPA was designed to
    remedy. The plaintiff moved for summary disposition with regard to
    the affirmative defense of waiver, asserting that the purported waiver
    was invalid as a matter of law because a parent may not waive,
    release, or compromise claims by or against his or her child. The
    court, Donald A. Johnston, J., held that the waiver was valid and
    should be given effect. The court dismissed the claim of ordinary
    negligence, but declined to dismiss the gross-negligence claim and the
    claim alleging violation of the MCPA, holding that further testimony
    was necessary before the issues could be decided. The court ques-
    tioned application of an open-and-obvious-danger defense and re-
    jected the assertion that the defendant had no duty to supervise the
    plaintiff because of the fact that his parents were present. The court
    thereafter rejected the plaintiff's assertion that the defendant vio-
    lated public policy through false advertising or claims regarding the

safety of the facility. Both parties sought leave to appeal. The Court of Appeals granted both applications and consolidated the appeals.

The Court of Appeals *held*:

1. Michigan caselaw adheres to the common-law precept that a parent has no authority merely by virtue of the parental relation to waive, release, or compromise claims of his or her child. Michigan does permit specific statutory exceptions to the common-law rule of preclusion of parental authority regarding the release or waiver of children's rights.

2. No statute permits a parent to release the property rights of his or her child under the circumstances presented in this case.

3. The trial court's determination regarding the validity of the waiver must be reversed and the matter must be remanded for reinstatement of the negligence claim.

4. The trial court properly determined that the plaintiff failed to demonstrate that the defendant possessed a substantial lack of concern for the plaintiff's safety or well-being. Summary disposition of the gross-negligence claim was not error.

5. The open-and-obvious danger doctrine is inapplicable to this action because the case involves a claim of negligence and does not meet the definitional requirements of either a premises-liability action or a products liability action.

6. The presence of the plaintiff's parents did not serve to abrogate the defendant's duty as the premises owner.

7. There is no evidence that the defendant tried to deceptively obtain a waiver. The trial court erred as a matter of law in failing to grant the defendant's motion for summary disposition of the MCPA claim.

Reversed and remanded.

BANDSTRA, P.J., concurring, wrote separately to stress that the result that must be reached in this case has a great impact and therefore the Legislature or the Supreme Court should address and further consider the issues raised in this case.

SCHUETTE, J., concurring, wrote separately to emphasize several issues of extreme legal and policy significance that should be addressed as a consequence of this decision.

PARENT AND CHILD — WAIVER OF CHILD'S CLAIMS.

A parent has no authority merely by virtue of the parental relation to waive, release, or compromise claims of his or her child either before or after such claims arise; exceptions to this common-law rule may be provided by statute.

*Rhoades McKee PC* (by *Gregory G. Timmer, Paul A. McCarthy*, and *Stephen J. Hulst*) for the plaintiff.

*Feuer & Kozerski, PC* (by *Scott L. Feuer*), for the defendant.

Before: BANDSTRA, P.J., and TALBOT and SCHUETTE, JJ.

TALBOT, J. Trent Woodman, a minor, through his mother and next friend, Sheila Woodman, appeals the orders granting defendant's motion for summary disposition of plaintiff's negligence claim and denying plaintiff's motion for summary disposition with regard to defendant's affirmative defense of waiver. Defendant appeals the order denying defendant's motion for summary disposition of plaintiff's claims of gross negligence and violation of the Michigan Consumer Protection Act.[1] I would reverse and remand to the trial court.

I. FACTUAL HISTORY

Sheila Woodman rented defendant's facility, which contains large, inflatable play equipment, for her son's fifth birthday party. Defendant provided invitations to Sheila Woodman, which she subsequently forwarded to the party guests. The content of the invitation was as follows:

_____ has been invited to a _____ party
for _____.
The party will be held at **Bounce Party**
on _____, _____ from _____ to _____.
Please RSVP at _____ before _____.

---

[1] This Court granted each party's application for leave to appeal and consolidated the two appeals. *Woodman v Kera LLC,* unpublished orders of the Court of Appeals, entered April 13, 2007 (Docket Nos. 275079 and 275882).

We are hosting our party at Bounce Party in Kentwood. We will have chaperon[e]s present to ensure that this is a safe and enjoyable party. We need a parent/guardian to review and sign the information below and send it with your child on party day. Please have your child at Bounce Party 15 minutes before the party start time.

Thank you, _____

              Your Host

Bounce Party is an indoor inflatable play arena with interactive inflatables. Your child may have the opportunity to bounce, slide, maneuver mazes, run challenge courses, bouncy box, bungee basketball and joust. Your hosts will have chaperon[e]s on site and we will have staff members present. To ensure a safe and enjoyable party please be sure that your child follows these few simple rules prior to attending the party.

◊ Please RSVP to your host. We really hope you will be able to attend the party.

◊ Wear CLEAN socks. No shoes or bare feet are allowed in the play arena.

◊ Wear comfortable clothes.

◊ Leave all jewelry, sharp objects, keys, hair bands, pencils, watches, etc. at home.

◊ Let your child know that good manners are expected and inappropriate behavior will result in removal.

◊ Be sure that the parent/guardian of the guest signs this release and the guest brings it with them to the party. Anyone without parent/guardian approval will not be able to participate in the arena games. If you have multiple guests in your family, you can list all their names on this one form.

THE UNDERSIGNED, by his/her signature herein affixed does acknowledge that any physical activities involve some element of personal risk and that, accordingly, in consideration for the undersigned waiving his/her claim against

BOUNCE PARTY, and their agents, the undersigned will be allowed to participate in any of the physical activities.

By engaging in this activity, the undersigned acknowledges that he/she assumes the element of inherent risk, in consideration for being allowed to engage in the activity, agrees to indemnify and hold BOUNCE PARTY, and their agents, harmless from any liability for personal injury, property damage or wrongful death caused by participation in this activity. Further, the undersigned agrees to indemnify and hold BOUNCE PARTY, and their agents, harmless from any and all costs incurred including, but not limited to, actual attorney's fees that BOUNCE PARTY, and their agents, may suffer by an action or claim brought against it by anyone as a result of the undersigned's use of such facility.

Participant:_____ Signature: _____
              PRINTED NAME                Parent or Legal
                                        Guardian's signature
                                     if participate [sic] is under
                                              age 18.

Date: _____

**BE SURE YOU COMPLETE THIS CARD AND SEND IT WITH THE PARTY GUEST!**

On the day of the party, plaintiff's father, Jeffrey Woodman, signed the above document on plaintiff's behalf. An employee of defendant conducted a "safety talk" before the party started, which defendant asserted specifically included an instruction not to jump from the slide. In addition, written rules posted on the slide and the wall informed guests not to jump from the slide. However, after correctly using the slide five times, plaintiff jumped from the top of the slide, fell to the ground, and broke his leg.

## II. LOWER-COURT PROCEDURAL HISTORY

Plaintiff, through his mother and next friend, filed a three-count complaint against defendant, alleging gross

negligence, negligence, and violation of Michigan's Consumer Protection Act (MCPA), MCL 445.901 *et seq.* Plaintiff alleged that defendant knowingly failed to provide supervision, ignored the slide's manufacturer's warnings and safety instructions, did not properly equip the slide with available safety devices, and failed to have an attendant to monitor the slide. Plaintiff contended that these failures and omissions were the direct and proximate causes of his injuries. With respect to the MCPA claim, plaintiff alleged that defendant falsely advertised itself as providing a safe play environment when, in fact, defendant knew it failed to install appropriate safety equipment and provide adequate supervision. Defendant filed an answer to the complaint, denying plaintiff's claims and asserting affirmative defenses, including the defense of waiver.

On July 27, 2006, pursuant to MCR 2.116(C)(7), (8), and (10), defendant moved for summary disposition of all three counts. Defendant argued that plaintiff's father signed a valid release on behalf of plaintiff and waived all of plaintiff's potential claims against defendant and that plaintiff could not prove gross negligence. Further, even if gross negligence could be demonstrated, defendant contended that liability was precluded because the danger of jumping from the slide constituted an open and obvious hazard. Defendant asserted that it had no duty to supervise plaintiff because his parents were with him at the time of the accident. Defendant urged the trial court to dismiss plaintiff's MCPA claim because defendant did not make any misrepresentations and the allegations made in the complaint do not comprise the type of case the MCPA was designed to remedy. Concurrently, plaintiff moved for summary disposition on defendant's affirmative defense of waiver, pursuant to MCR 2.116(C)(8) and (10). Plaintiff argued that the purported waiver was

invalid as a matter of law because a parent may not waive, release, or compromise claims by or against his or her child.

The trial court conducted a hearing on the summary-disposition motions on September 14, 2006. The trial court determined that the waiver, signed by plaintiff's parent, was valid and should be given effect. When granting summary disposition on the waiver issue, the trial court noted the absence of "any Michigan case which says that a parent who signs a waiver like this one prior to a child engaging in an activity is engaging in an act which is a legal nullity." The trial court further opined that it concurred with the general proposition that a parent can validly execute a waiver approving his or her child's participation in an activity and dismissed plaintiff's claim of ordinary negligence.

Considering plaintiff's gross-negligence claim, the trial court opined that plaintiff's counsel provided a sufficient demonstration that defendant ignored specific instructions or recommendations regarding use of and staffing for the slide. The trial court denied defendant's motion to dismiss plaintiff's gross-negligence claim because it found that "a reasonable finder of fact could conclude from that conduct that it constitutes a substantial indifference to whether an injury results from the operation of the slide."

Addressing defendant's defense of open and obvious danger, the trial court questioned whether a five-year-old had the intellectual capacity to comprehend the dangers inherent in jumping off a slide. Recognizing that negligence cannot be imputed to a child under the age of seven, the trial court reasoned that "[i]f negligence can't be imputed to them, I'm not really sure how they can be barred from proceeding by the open and obvious doctrine." The trial court further rejected de-

fendant's assertion that it had no duty to supervise plaintiff because of the presence of his parents, ruling that "the nature of the defendant's business is such that they have an inherent obligation in that regard." Because the scope of defendant's duty and whether it breached an existent duty comprised questions of fact for the jury, the trial court declined to grant defendant's request for summary disposition on this issue. Although the trial court questioned the applicability of the MCPA to plaintiff's claim, it declined to dismiss the claim until the issue could be further developed.

On November 6, 2006, pursuant to MCR 2.116(C)(8) and (10), plaintiff again moved for summary disposition regarding defendant's affirmative defense of waiver, asserting that the invitation language was insufficient to constitute a waiver. Plaintiff argued that the invitation did not waive or indemnify negligence claims against defendant because the document only addressed risks inherent in participating in the activities at defendant's facility. Defendant responded that the invitation constituted a valid waiver and barred all claims by plaintiff of ordinary negligence. The trial court concluded that the language contained in the waiver sufficiently apprised the signatory of the inherent risks involved in the activities and the assumption of those risks. Finding the language of the waiver provided clear notice, the trial court declined plaintiff's request to invalidate the waiver and also rejected plaintiff's assertion that defendant violated public policy through false advertising or claims regarding the safety of the facility. The trial court's rulings were subsequently memorialized in an order entered November 27, 2006.

Plaintiff moved for reconsideration of the trial court's decision to uphold the validity of the invitation

as a valid waiver of the negligence claim. Plaintiff argued that the trial court should reconsider its ruling because courts in other jurisdictions have invalidated similar provisions purporting to waive the negligence of for-profit businesses. However, plaintiff acknowledged that other state courts have upheld waivers to preclude negligence claims in situations involving nonprofit organizations or schools. The trial court denied plaintiff's motion for reconsideration, and this appeal ensued.

### III. ISSUES ON APPEAL

In Docket No. 275079, defendant challenges the failure of the trial court to dismiss plaintiff's claims of gross negligence and violation of the MCPA. Defendant additionally asserts that the danger posed by jumping off the high point of a slide constitutes an open and obvious danger and contends that it did not have a duty to supervise plaintiff given the presence and proximity of his father to the slide when plaintiff was injured.

In Docket No. 275882, plaintiff poses the question whether the law and public policy of this state preclude effectuation of a preinjury waiver signed by a parent on behalf of his or her minor child. Plaintiff specifically queries the applicability of such a waiver to preclude liability of a for-profit business such as that engaged in by defendant.

### IV. STANDARD OF REVIEW

This Court reviews a trial court's grant or denial of summary disposition de novo. *Willett v Waterford Charter Twp,* 271 Mich App 38, 45; 718 NW2d 386 (2006). Issues of statutory interpretation also comprise questions of law, which we review de novo. *Newton v Bank West,* 262 Mich App 434, 437; 686 NW2d 491 (2004).

In accordance with MCR 2.116(C)(7), a litigant may seek dismissal of a claim on the basis that it is barred because of a release. The filing of supportive materials or documents is not required. *Maiden v Rozwood,* 461 Mich 109, 119; 597 NW2d 817 (1999). However, if documentation is provided in conjunction with a motion for dismissal under this subsection of the court rule, the materials provided must constitute admissible evidence and require consideration by the court. MCR 2.116(G)(5). All the plaintiff's well-pleaded factual allegations and other admissible documentary evidence must be accepted as true and construed in favor of the plaintiff, unless contradicted by documentation filed by the movant. *Maiden, supra* at 119.

As discussed in *Healing Place at North Oakland Med Ctr v Allstate Ins Co,* 277 Mich App 51, 55-56; 744 NW2d 174 (2007):

> Summary disposition under either MCR 2.116(C)(8) or (C)(10) presents an issue of law for [the Court's] determination and, thus, [the Court] review[s] a trial court's ruling on a motion for summary disposition de novo. Where the parties rely on documentary evidence, appellate courts proceed under the standards of review applicable to a motion made under MCR 2.116(C)(10).

> A motion made under MCR 2.116(C)(10) tests the factual support for a claim and should be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. When the burden of proof at trial would rest on the nonmoving party, the nonmovant may not rest upon mere allegations or denials in the pleadings, but must, by documentary evidence, set forth specific facts showing that there is a genuine issue for trial. A genuine issue of material fact exists when the record, drawing all reasonable inferences in favor of the nonmoving party, leaves open an issue upon which reasonable minds could differ.

When deciding a motion for summary disposition under this rule, a court must consider the pleadings, affidavits, depositions, admissions, and other documentary evidence then filed in the action or submitted by the parties in the light most favorable to the nonmoving party. But such materials "shall only be considered to the extent that [they] would be admissible as evidence . . . ." [Quotation marks and citations omitted.]

### V. OTHER JURISDICTIONS

#### A. GENERAL OVERVIEW

At its most basic level, the predominant issue presented in this case concerns the authority of a parent to bind his or her minor child to an exculpatory agreement, which functions to preclude a defendant's liability for negligence, before an injury has even occurred. In its most general sense the issue juxtaposes the inherent rights and fundamental authority of a parent to make determinations for his or her minor child pursuant to the Fourteenth Amendment against public-policy concerns and the state's authority in accordance with the doctrine of *parens patriae.*[2]

The United States Supreme Court has recognized the fundamental right of parents to make decisions pertaining to the care, custody, and control of their minor children. See *Troxel v Granville,* 530 US 57; 120 S Ct 2054; 147 L Ed 2d 49 (2000). The recognition of this right is based, in part, on

[t]he law's concept of the family [which] rests on a presumption that parents possess what a child lacks in matu-

---

[2] " 'Parens patriae,' which is Latin for 'parent of his or her country,' describes 'the state in its capacity as provider of protection to those unable to care for themselves.' " *Global Travel Marketing, Inc v Shea,* 908 So 2d 392, 399 (Fla, 2005), quoting Black's Law Dictionary (8th ed), p 1144.

rity, experience, and capacity for judgment required for
making life's difficult decisions. More important, histori-
cally it has recognized that natural bonds of affection lead
parents to act in the best interests of their children.
[*Parham v J R,* 442 US 584, 602; 99 S Ct 2493; 61 L Ed 2d
101 (1979).]

In addition, a presumption exists that "fit parents act in
the best interests of their children." *Troxel, supra* at 68.
Consequently, "so long as a parent adequately cares for
his or her children (*i.e.*, is fit), there will normally be no
reason for the State to inject itself into the private
realm of the family to further question the ability of
that parent to make the best decisions concerning the
rearing of that parent's children." *Id.* at 68-69. Histori-
cally, this is consistent with rulings by the United States
Supreme Court indicating that the inherent nature of
parenthood is comprised of the companionship of a child
and the right to make decisions pertaining to the child's
care, control, health, education, religious affiliations,
and associations. See *Pierce v Society of Sisters,* 268 US
510, 534-535; 45 S Ct 571; 69 L Ed 1070 (1925); *Meyer
v Nebraska,* 262 US 390, 399; 43 S Ct 625; 67 L Ed 1042
(1923).

Some jurisdictions have used these precepts regard-
ing the dominance of parental authority to validate
preinjury waivers to preclude liability. By way of ex-
ample, the United States District Court for the District
of Colorado has upheld the enforceability of a waiver
signed by a parent on behalf of his minor child. *Brooks
v Timberline Tours, Inc,* 941 F Supp 959 (D Colo, 1996).
See, also, *Lantz v Iron Horse Saloon, Inc,* 717 So 2d 590
(Fla App, 1998). In Massachusetts, upholding a paren-
tal waiver permitting a minor to participate in a school
cheerleading program, it was held: "In the circum-
stance of a voluntary, nonessential activity, we will not
disturb this parental judgment. This comports with the

fundamental liberty interest of parents in the rearing of their children, and is not inconsistent with the purpose behind our public policy permitting minors to void their contracts." *Sharon v City of Newton*, 437 Mass 99, 109; 769 NE2d 738 (2002). Specifically, the court noted "[t]he enforcement of the release is consistent with the Commonwealth's policy of encouraging athletic programs for youth and does not contravene the responsibility that schools have to protect their students." *Id.* at 110-111. The *Sharon* court indicated that its decision to uphold the validity of the waiver was consistent with specific exceptions based on public policy embodied in statutory provisions exempting nonprofit and volunteer organizations from negligence liability for similar activities. *Id.* at 109.

Other jurisdictions, relying on public-policy concerns pertaining to the protection of the best interests of minors, have ruled preinjury exculpatory agreements invalid. Rejecting "the argument that a parental release of liability on behalf of a minor child implicates a parent's fundamental right to direct the upbringing of his or her child," the New Jersey Supreme Court in *Hojnowski v Vans Skate Park*, 187 NJ 323, 339; 901 A2d 381 (2006), instead emphasized that "the question whether a parent may release a minor's future tort claims implicates wider public policy concerns and the *parens patriae* duty to protect the best interests of children." The court opined that the need to protect children was not at odds and did not unnecessarily interfere "with the constitutionally protected right of a parent to permit or deny a child's participation in any or all of the recreational activities that may be available." *Id.* (quotation marks and citation omitted). Relying on the legislative enactments historically providing protection to children's interests, coupled with the need to "discourage negligent activity on the

part of commercial enterprises attracting children," the court held "that a parent's execution of a pre-injury release of a minor's future tort claims arising out of the use of a commercial recreational facility is unenforceable." *Id.* at 338.

The Utah Supreme Court, in *Hawkins v Peart,* 37 P3d 1062, 1066 (Utah, 2001), citing *Scott v Pacific West Mountain Resort,* 119 Wash 2d 484; 834 P2d 6 (1992), relied on the "premise that a parent may not unilaterally release a child's claims *after* a child's injury" to support its "conclusion that a parent does not have the authority to release a child's claims *before* an injury." (Emphasis in original.) Refusing to attribute validity to an executed release on the basis of the timing of the injury, the court explained its reasoning, stating, in relevant part:

> An exculpatory clause that relieves a party from future liability may remove an important incentive to act with reasonable care. These clauses are also routinely imposed in a unilateral manner without any genuine bargaining or opportunity to pay a fee for insurance. The party demanding adherence to an exculpatory clause simply evades the necessity of liability coverage and then shifts the full burden of risk of harm to the other party. Compromise of an existing claim, however, relates to negligence that has already taken place and is subject to measurable damages. Such releases involve actual negotiations concerning ascertained rights and liabilities. Thus, if anything, the policies relating to restrictions on a parent's right to compromise an existing claim apply with even greater force in the preinjury, exculpatory clause scenario. [*Hawkins, supra* at 1066.]

Similarly, the Colorado Supreme Court, in *Cooper v Aspen Skiing Co,* 48 P3d 1229, 1232 (Colo, 2002),[3] while

---

[3] We note that the *Cooper* case has subsequently been superseded by statute. See *Pollock v Highlands Ranch Community Ass'n, Inc,* 140 P3d 351 (Colo App, 2006).

recognizing the dissonance created between the "well-settled principle that '[a] minor during his minority, and acting timely on reaching his majority, may disaffirm any contract that he may have entered into during his minority' " and " 'our traditional regard for freedom of contract,' " ruled in accordance with public-policy concerns, which established "protections which preclude parents or guardians from releasing a minor's own prospective claim for negligence." *Id.* (citations omitted). The court opined that " 'since a parent generally may not release a child's cause of action after injury, it makes little, if any, sense to conclude a parent has the authority to release a child's cause of action prior to an injury.' " *Id.* at 1233 (citation omitted). As a result, the court ruled, in relevant part:

> Colorado's public policy disallows a parent or guardian to execute exculpatory provisions on behalf of his minor child for a prospective claim based on negligence. Specifically, we hold that a parent or guardian may not release a minor's prospective claim for negligence and may not indemnify a tortfeasor for negligence committed against his minor child. [*Id.* at 1237.]

### B. WAIVER EXCEPTIONS

There appear to be two types of cases that recognize exceptions to the preclusion of a parent's unilateral authority to waive or release a child's claims before or even after an injury. The first type of case deals with specific, statutorily created exceptions, which restrict the forum for bringing a claim rather than provide an absolute waiver of any negligence. Typically, "a waiver executed by a parent on behalf of a minor is supported by public policy when it relates to obtaining medical care, insurance, or participation in school or community sponsored activities." *Fields v Kirton,* 961 So 2d 1127,

1129 (Fla App, 2007).[4] Distinguishing between the restriction or preclusion of "parents from deciding what activities may be appropriate for their minor children's participation" and "the effect of [a] release insulating the provider of the activity from liability for negligence inflicted upon the minor," the court in *Fields* opined that "[t]he decision to absolve the provider of an activity from liability for any form of negligence (regardless of the inherent risk or danger in the activity) goes beyond the scope of determining which activity a person feels is appropriate for their child." *Id.* Consequently, on the basis of the potential effect resulting from a parent's determination to execute a preinjury release of a minor child's property rights, the *Fields* court determined that the child's "rights cannot be waived by the parent absent a basis in common law or statute." *Id.* at 1130. Often, these cases involve waivers regarding the right to mediate or arbitrate disputes for potential or future injuries and have identified an important distinction between "[w]hether a parent may waive his or her child's substantive rights" and "whether a parent may agree that any dispute arising from the contract may be arbitrated rather than decided in a court of law." *Global Travel Marketing, Inc v Shea,* 908 So 2d 392, 401 (Fla, 2005). In these instances, the courts distinguish arbitration clauses from releases of liability:

> "[W]e note that the parent's consent and release to arbitration only specifies the forum for resolution of the child's claim; it does not extinguish the claim. Logically, if a parent has the authority to bring and conduct a lawsuit

---

[4] We note that the Florida Supreme Court accepted jurisdiction in this matter to address the question certified by the Florida District Court of Appeal:"Whether a parent may bind a minor's estate by the pre-injury execution of a release." *Fields, supra* at 1130; *Kirton v Fields,* 973 So 2d 1121 (Fla, 2007).

on behalf of the child, he or she has the same authority to choose arbitration as the litigation forum." [*Id.* at 402, quoting *Cross v Carnes,* 132 Ohio App 3d 157, 169; 724 NE2d 828 (1998).]

The second type of exception used to uphold the validity of a preinjury waiver is reliant on public-policy arguments. Our research indicates that many jurisdictions engage in this type of compromise or hybrid, upholding the validity of certain releases or exculpatory agreements in limited or defined circumstances involving schools, religious organizations, and other public, nonprofit, or voluntary functions provided to children within communities. Courts have attempted to define the standards or elements to be used in making these determinations. By way of example, in *Tunkl v Univ of California Regents,* 60 Cal 2d 92, 99-101; 32 Cal Rptr 33; 383 P2d 441 (1963) (footnotes omitted), the court listed the criteria to be used for determining public-policy limitations on releases as follows:

> [T]he attempted but invalid exemption involves a transaction which exhibits some or all of the following characteristics. [1] It concerns a business of a type generally thought suitable for public regulation. [2] The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public. [3] The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards. [4] As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services. [5] In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain

protection against negligence. [6] Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents.

A more abbreviated version of the elements to be considered in these circumstances is provided in *Jones v Dressel,* 623 P2d 370, 376 (Colo, 1981), which states, in relevant part:

> In determining whether an exculpatory agreement is valid, there are four factors which a court must consider: (1) the existence of a duty to the public; (2) the nature of the service performed; (3) whether the contract was fairly entered into; and (4) whether the intention of the parties is expressed in clear and unambiguous language.

Notably, *Jones* cited the standard elucidated in *Tunkl* for determining "the existence of a duty to the public." *Id.*

In this line of cases, the focus of the courts is directed "not [on] whether the release violates public policy; but rather that public policy itself justifies the enforcement of [the] agreement." *Zivich v Mentor Soccer Club, Inc,* 82 Ohio St 3d 367, 370; 696 NE2d 201 (1998). Specifically, in *Zivich* the court summarized its concerns as follows:

> It cannot be disputed that volunteers in community recreational activities serve an important function. Organized recreational activities offer children the opportunity to learn valuable life skills. It is here that many children learn how to work as a team and how to operate within an organizational structure. Children also are given the chance to exercise and develop coordination skills. Due in great part to the assistance of volunteers, nonprofit organizations are able to offer these activities at minimal cost. . . . Clearly, without the work of its volunteers, these nonprofit organizations could not exist, and scores of children would be without the benefit and enjoyment of

organized sports. Yet, the threat of liability strongly deters many individuals from volunteering for nonprofit organizations. Insurance for the organizations is not the answer, because individual volunteers may still find themselves potentially liable when an injury occurs. Thus, although volunteers offer their services without receiving any financial return, they place their personal assets at risk.

Therefore, faced with the very real threat of a lawsuit, and the potential for substantial damage awards, nonprofit organizations and their volunteers could very well decide that the risks are not worth the effort. Hence, invalidation of exculpatory agreements would reduce the number of activities made possible through the uncompensated services of volunteers and their sponsoring organizations. [*Id.* at 371-372 (citations omitted).]

On the basis of this reasoning, the *Zivich* court opined that "public policy justifies giving parents authority to enter into these types of binding agreements on behalf of their minor children" and that "enforcement of these agreements may well promote more active involvement by participants and their families, which, in turn, promotes the overall quality and safety of these activities." *Id.* at 372. Consequently, the court, defining the parameters of the ruling, stated, in relevant part, that "parents have the authority to bind their minor children to exculpatory agreements in favor of volunteers and sponsors of nonprofit sport activities where the cause of action sounds in negligence. These agreements may not be disaffirmed by the child on whose behalf they were executed." *Id.* at 374. This same reasoning was acknowledged and adopted in *In re Royal Caribbean Cruises Ltd,* 459 F Supp 2d 1275, 1279-1280 (SD Fla, 2006), when the court refused to exonerate Royal Caribbean from liability on the basis of the execution of a waiver by the parent of a minor child. Citing with approval *Zivich* and other preinjury cases in various jurisdictions, the court distinguished their holdings

from the circumstances in the present action as involving "parental pre-injury releases executed for purposes of a minor's participation in nonprofit, community based, and/or school related activities rather than parental pre-injury releases related to private for profit activities." *Id.* at 1280.

### VI. MICHIGAN

#### A. OVERVIEW

In analyzing the current status of the law in Michigan, our starting point is the well-recognized common-law premise, cited and adopted through a prolonged history of caselaw that "in Michigan a parent has no authority merely by virtue of the parental relation to waive, release, or compromise claims of his or her child. Generally speaking, the natural guardian has no authority to do an act which is detrimental to the child." *Tuer v Niedoliwka,* 92 Mich App 694, 698-699; 285 NW2d 424 (1979). Caselaw in Michigan demonstrates adherence to this common-law precept, which places strict limitations on a parent's authority to compromise claims on behalf of the parent's minor child. By way of example, we note our Supreme Court's ruling in *O'Brien v Loeb,* 229 Mich 405, 408; 201 NW 488 (1924), involving injuries sustained by a 10-year-old child in a collision between an automobile and a horse-drawn wagon. Before initiation of trial, the child's mother purportedly accepted a sum in full settlement of her child's claims arising from the accident. Noting the absence of a "contract by the infant," the Court stated, in relevant part:

> The transaction was carried on entirely with the mother, who was without authority to bind him in the release of his cause of action against the defendants. An infant is not bound by a contract made for him or in his

name by another person purporting to act for him, unless
such person has been duly appointed his guardian or next
friend and authorized by the court to act and bind him. [*Id.*
(quotation marks and citation omitted).]

Despite recognition by our Court that "[t]he status of a
parent is one of guardian by nature," courts in this state
have consistently ruled that "[u]nless authorized by
statute, a guardian is without power to bind the infant
or his estate." *Reliance Ins Co v Haney,* 54 Mich App
237, 242; 220 NW2d 728 (1974). In *Reliance Ins Co,* this
Court specifically determined that even the "natural
guardian," or parent of the minor child, "may not
consent to the surrender of life insurance which has
been taken out for the benefit of the child." *Id.* This
Court's ruling reflects public-policy concerns regarding
the need to protect the rights of minor children as
predominant to the inherent rights of their parents at
least to the extent that a "guardian has no authority to
do any act which is detrimental to his ward." *Id.* A
detrimental act is construed as one that effectively
abandons or compromises any right or interest belong-
ing exclusively to the minor child. *Id.* at 243 (finding
"[t]he very fact that [the child] was injured by an
uninsured motorist and the insurer denies coverage on
the basis of the father's waiver for the son indicates a
detrimental act").

Limitations on parental authority, consistent with
this common-law rule, have also been imposed in cases
involving support of a minor child. For instance, "an
illegitimate child's right to support from a putative
father cannot be contracted away by its mother, and
that any release or compromise executed by the mother
is invalid to the extent that it purports to affect the
rights of the child." *Tuer, supra* at 699. Caselaw has
further emphasized restrictions on parental authority
by recognizing a parent's right to stipulate or approve

an "annulment judgment" but precluding that agreement from affecting the rights of the minor children involved to a full hearing on the issue of paternity. *In re Kinsella Estate,* 120 Mich App 199, 203; 327 NW2d 437 (1982). Referencing public policy, this Court "has taken a dim view of agreements purporting to sign away the rights of a child, particularly when the result of such an agreement may be that the child becomes a public charge . . . ." *Van Laar v Rozema,* 94 Mich App 619, 624; 288 NW2d 667 (1980).

This overriding public-policy concern is demonstrated in procedures and rules mandating court oversight, which have been implemented to assure the protection of minors and their rights in postinjury cases. For example, MCR 2.420(A), consistently with the doctrine of *parens patriae,* delineates strict limitations on parental authority regarding settlements and judgments for minors. Specifically,

> MCR 2.420(A) provides that the rule applies only to settlements in cases "brought for a minor by a next friend, guardian, or conservator," which we read as further support for our holding that a parent has no authority to compromise an *unliquidated claim* or to liquidate a claim on behalf of a child absent the formal procedures and proper supervision suggested by the court rule. The obvious basis for such a rule is to ensure that the best interests of the minor child are protected by (1) the appointment of a next friend, guardian, or conservator to represent the minor *and* (2) the oversight of the trial court, or probate court, before an action is commenced, to scrutinize any proposal that compromises the minor's rights. [*Smith v YMCA of Benton Harbor/St Joseph,* 216 Mich App 552, 556; 550 NW2d 262 (1996) (emphasis in original).]

We note that even when court-imposed protections, such as the appointment of a guardian or next friend are in place, "[i]f the next friend . . . is a person who has

made a claim in the same action and will share in the settlement or judgment of the minor . . . then a guardian ad litem for the minor . . . must be appointed . . . to approve the settlement or judgment." MCR 2.420(B)(2). The implementation of such safeguards further demonstrates the overriding importance attributed to assuring the best interest of the child is maintained and is not compromised by any potential conflict of interest. See *Bowden v Hutzel Hosp*, 252 Mich App 566, 572-573; 652 NW2d 529 (2002), mod 468 Mich 851 (2003).

Various statutory provisions afford similar protections to minors, including but not limited to: (a) MCL 700.5102, which restricts the payment or delivery of property to minors not in excess of $5,000 in value unless certain safeguards are present; (b) MCL 700.5401, involving court appointment of a conservator or issuance of a protective order to ensure oversight in the management of a minor's estate; and (c) MCL 600.5851, tolling accrual of actions in order to preserve a child's rights to initiate certain causes of action, following removal of the disability of an individual's status as a minor.

These provisions function as checks on parental authority in an effort to ensure the protection of a minor child's interest by requiring the appointment of a conservator or guardian approved by the court to handle the minor's affairs, or by provision of additional time following attainment of the age of majority by a minor to exercise certain rights, rather than the automatic assumption of this role by a parent. The implementation of these provisions is indicative of an adherence to public policy, which favors the protection of the contractual rights of minors consistent with the common-law limitations placed on parental authority to compromise claims belonging to their children.

### B. WAIVER EXCEPTIONS

Michigan, consistently with other jurisdictions, does permit specific statutory exceptions to the common-law rule of preclusion of parental authority regarding the release or waiver of children's rights. We note that such legislatively created exceptions are limited and strictly construed. "Because the common law may be abrogated by statute, a child can be bound by a parent's act when a statute grants that authority to a parent." *Benson v Granowicz*, 140 Mich App 167, 169; 363 NW2d 283 (1984). See, also, *Osborne v Arrington*, 152 Mich App 676, 679-680; 394 NW2d 67 (1986); *McKinstry v Valley Obstetrics-Gynecology Clinic, PC*, 428 Mich 167, 192-193; 405 NW2d 88 (1987) (recognizing the enactment of former MCL 600.5046[2] "changes the common law to permit a parent to bind a child to an arbitration agreement").

Currently, our Legislature has clearly identified certain, very specific situations in which parents are allowed to compromise the rights of their minor child. However, nothing has been discovered in the current statutory scheme that would permit a parent to release the property rights of his or her child in circumstances similar to those in this litigation. Specifically, this Court is aware of no legislative enactments upholding exculpatory agreements, executed by parents on behalf of their minor children before injury, that waive liability for injuries incurred in either commercial or nonprofit settings. Rather, given the preclusion of parental authority to compromise postinjury claims initiated on behalf of children without significant court oversight or the institution of legislatively created safeguards, it is counterintuitive to believe it acceptable or justifiable that inchoate rights or preinjury claims could be waived by parents, particularly given the absence of sufficient

factual information or informed negotiation in such preinjury circumstances.[5] Given the caselaw and the context of legislative enactments and safeguards, it is apparent that Michigan is particularly cautious when it comes to permitting the compromise of any child's rights and strictly adheres to the common-law preclusion of parental authority in these situations, recognizing only very limited and specific statutory exceptions to this general rule. Hence, in the absence of a clear or specific legislative directive, we can neither judicially assume nor construct exceptions to the common law extending or granting the authority to parents to bind their children to exculpatory agreements. Thus, the designation or imposition of any waiver exceptions is solely within the purview of the Legislature.[6]

I am particularly cognizant of the fact that to uphold the validity of preinjury waivers would afford minor children fewer protections than provided for postinjury claims, which statutorily require court oversight or approval for settlement. Concurrently, I acknowledge the public-policy concerns and reasoning underlying

---

[5] Contrary to the concurrences, I find the arguments validating preinjury waivers less persuasive than those regarding postinjury waivers based on (a) the absence of sufficient information to make informed decisions regarding waiver when an injury has not yet occurred, and (b) the importance of affording minors greater, or at least equivalent, protections, to those afforded in postinjury cases and to adults. In addition, I do not agree that our determination regarding the invalidation of preinjury waivers serves to undermine parental authority. Parents continue to retain decision-making authority regarding their child's participation in select activities. Our ruling only serves to assure that such determinations are fully informed in order to effectively balance any risks and benefits inherent in the chosen activities and to afford adequate protections from negligent behavior in the conduct of those activities.

[6] Further, I would strongly encourage the Legislature to evaluate this issue, including any distinctions to be acknowledged regarding treatment of preinjury waivers involving for-profit versus nonprofit organizations or programs.

distinctions developed in other jurisdictions pertaining to the validity of such waivers dependent on the nature of the activity engaged in regarding for-profit and nonprofit activities or services. However, even following the reasoning of other jurisdictions, the exceptions recognized in those cases are not applicable given the for-profit nature of defendant's business. Without specific legislative direction this Court is precluded from defining or implementing any such divergence from the common-law preclusion regarding the validity of any form of waiver by a parent on behalf of his or her minor child. Although there exists in this state a clear intention to give predominance to protecting the rights of minor children, "[t]he Michigan Legislature is the proper institution in which to make such public policy determinations, not the courts." *Huron Ridge LP v Ypsilanti Twp,* 275 Mich App 23, 45; 737 NW2d 187 (2007).

While this ruling has significant and far-reaching implications regarding practices routinely engaged in by organizations and businesses providing valuable services and activities for minor children and has the potential to increase litigation and affect the availability of programs to younger members of the community, I have no alternative but to recognize the current status of our law and follow its precepts. "It is not the function of the courts to usurp the constitutional role of the legislature and judicially legislate that which necessarily must originate, if it is to be law, with the legislature." *Fields, supra* at 1130.

### C. CONCURRENCES

Contrary to the concerns expressed in my colleagues' respective concurrences, I welcome the potential for discourse and examination that may be occasioned by

our ruling in this case. While certain organizations may be required to reevaluate their services and delivery of activities as a result of our determination, I believe this is a small price to pay to protect the interests of the most vulnerable members of our society. Hopefully, our ruling will serve to disrupt the complacency, which has developed over the years, from the proliferation and pro forma acceptance of preinjury waivers and will serve to refocus and place liability where it belongs by removing the artificial protections afforded to organizations or businesses that are negligent in the provision of services to children. Further, while it may, from a social-policy perspective, be beneficial to exempt nonprofit and other specified organizations from preinjury liability, the establishment of protections for such groups is easily provided if our Legislature chooses to act. Our ruling is not significant because it may result in a disruption of the status quo regarding the complacent acceptance of the use of preinjury waivers for minors. Rather, the decision in this case is important because it serves as an affirmation of the priority we place on the protection of the health and well-being of our children.

### D. CONCLUSION

Therefore, I would determine that preinjury waivers effectuated by parents on behalf of their minor children are not presumptively enforceable. Specifically, within the context of our state's overriding policy, and in the absence of any specific legislative exceptions permitting the waiver of liability by parents in these situations, the release signed on behalf of plaintiff's son cannot be construed as valid. Consequently, I would reverse the trial court's determination regarding the validity of the challenged waiver and remand the case for reinstatement of plaintiff's negligence claim. Because our ruling

determines that the waiver is invalid, I need not address the parties' contentions pertaining to the scope or parameters of the waiver's language and content.

### VII. GROSS NEGLIGENCE

Defendant contends that the trial court erred in refusing to dismiss plaintiff's claim of gross negligence. "Gross negligence" is conduct that is so reckless that it demonstrates a substantial lack of concern for whether an injury results. *Xu v Gay,* 257 Mich App 263, 269; 668 NW2d 166 (2003). Evidence of ordinary negligence is insufficient to create a material question of fact regarding the existence of gross negligence. *Maiden, supra* at 122-123. The issue of gross negligence may be determined by summary disposition only where reasonable minds could not differ. *Jackson v Saginaw Co,* 458 Mich 141, 146; 580 NW2d 870 (1998).

Plaintiff contends that the failure of defendant to follow or implement the manufacturer's instructions regarding equipment to be used in conjunction with the slide and recommendations pertaining to adult supervision of its use constituted evidence of gross negligence. However, plaintiff ignores the fact that defendant did undertake certain actions to ensure the safety of its guests. It is undisputed that defendant's staff provided verbal instructions to the participants regarding safety and appropriate conduct or behavior before permitting use of the equipment and that certain rules regarding safe use of the equipment were posted. Further, plaintiff does not allege the minor children attending the party were completely unsupervised, only that insufficient supervision was provided. Considering the fact that defendant did undertake certain steps or precautions to prevent injury, there has been no demonstration that defendant possessed a substantial lack

of concern for the minor child's safety or well-being. Therefore, I would hold that the trial court erred by failing to grant summary disposition on plaintiff's claim of gross negligence. *Id.* at 151. Because I would determine that plaintiff's claim of gross negligence is not viable, I find no need to address defendant's assertion that it is entitled to summary disposition on the basis of a lack of proximate causation.

Subsumed within this issue are defendant's concomitant assertions that (1) the danger posed by jumping off the top of a slide is an open-and-obvious hazard, precluding the imposition of liability and (2) defendant did not have a duty to supervise the minor child given the presence of the child's parents at the time the injury occurred. I first address the assertion regarding the applicability of the open-and-obvious-danger doctrine.

As previously discussed by this Court, the applicability of the open-and-obvious-danger doctrine is dependent on the theory of liability presented and the nature of the duty that is at issue. *Hiner v Mojica,* 271 Mich App 604, 615; 722 NW2d 914 (2006). We have determined that this doctrine is applicable only to premises-liability actions and certain cases involving a failure to warn in product-liability cases. We have explicitly held the doctrine not to be applicable to claims of ordinary negligence. *Id.* at 615-616. When an injury develops from a condition of the land, rather than emanating from an activity or conduct that created the condition on the property, the action sounds in premises liability. *James v Alberts,* 464 Mich 12, 18-19; 626 NW2d 158 (2001). Because this case comprises a claim of negligence and does not meet the definitional requirements of either a premises-liability or a product-liability action, the open-and-obvious-hazard doctrine is inapplicable. Because I find the doctrine inapplicable, I need

not reach a determination regarding the trial court's ruling precluding the use of the doctrine with regard to minor children below the age of seven on the basis of the legal precept that precludes the ability to impute negligence to individuals within this young age group.

Defendant also contends that the trial court erred in finding it had a duty to protect the minor child given the presence of his parents at the site at the time of the injury. I concur with the trial court's denial of summary disposition on this basis because the presence of the minor child's parents did not serve to abrogate defendant of its duty as the premises owner. Generally, " 'a premises possessor owes a duty to an invitee to exercise reasonable care to protect the invitee from an unreasonable risk of harm caused by a dangerous condition on the land.' " *Bragan v Symanzik,* 263 Mich App 324, 330-331; 687 NW2d 881 (2004), quoting *Lugo v Ameritech Corp,* 464 Mich 512, 516; 629 NW2d 384 (2001). Landowners owe minor invitees the highest duty of care. *Bragan, supra* at 335. Accordingly, defendant had a duty to exercise reasonable care to protect plaintiff's son and all the children attending the party from dangerous conditions, regardless of whether adults related to the children were present. However, I find that defendant's argument is misplaced because the cause of action arises in negligence rather than premises liability.

VIII. MICHIGAN CONSUMER PROTECTION ACT

Lastly, defendant argues that the trial court improperly failed to dismiss plaintiff's claim under the MCPA. Notably, plaintiff's complaint does not identify the specific sections of the MCPA claimed to have been violated. In general, plaintiff's allegations comprise assertions of misrepresentation or "deceptive represen-

tations" regarding the safety of its facility or equipment
and the availability of supervision. Plaintiff further
implied fraud or purposeful misrepresentation by sug-
gesting defendant's purported waiver of liability was
improperly "disguised in the form of an invitation."
While not specified by plaintiff in his complaint, these
allegations were discussed in greater detail in plaintiff's
appellate brief, in which she asserted that defendant's
misrepresentations pertaining to the safety of the facil-
ity, equipment, and supervision constituted violations of
multiple subsections of MCL 445.903(1).

In general, the MCPA precludes the use of "[u]nfair,
unconscionable, or deceptive methods, acts, or practices
in the conduct of trade or commerce . . . ." MCL
445.903(1). "Trade or commerce" is defined as the
"conduct of a business providing goods, property, or
service primarily for personal, family, or household
purposes and includes the advertising, solicitation, of-
fering for sale or rent, sale, lease, or distribution of a
service or property, tangible or intangible, real, per-
sonal, or mixed, or any other article, or a business
opportunity." MCL 445.902(1)(g). The intention under-
lying the act is " 'to protect consumers in their pur-
chases of goods which are primarily used for personal,
family or household purposes.' " *Zine v Chrysler Corp,*
236 Mich App 261, 271; 600 NW2d 384 (1999) (citation
omitted). "The MCPA is a remedial statute designed to
prohibit unfair practices in trade or commerce and
must be liberally construed to achieve its intended
goals." *Forton v Laszar,* 239 Mich App 711, 715; 609
NW2d 850 (2000), overruled in part on other grounds
*Liss v Lewiston-Richards, Inc,* 478 Mich 203 (2007). In
order to have a valid MCPA claim presented, the "courts
must examine the nature of the conduct complained of
case by case and determine whether it relates to the
entrepreneurial, commercial, or business" aspects of

the defendant's profession. *Nelson v Ho,* 222 Mich App 74, 84; 564 NW2d 482 (1997).

Plaintiff contends that defendant advertised itself as a safe and supervised facility, even though it purportedly knowingly violated safety recommendations set forth by the manufacturer of its equipment, and tried to deceptively obtain a waiver by providing free invitations that contained the waiver, in violation of the MCPA. The gravamen of plaintiff's claim is negligence because the allegations center on the way defendant operated the slide, not the manner by which it solicited or advertised its business. See *Tipton v William Beaumont Hosp,* 266 Mich App 27, 33; 697 NW2d 552 (2005) (the gravamen of an action is determined by reading the claim as a whole). Further, plaintiff's claim that defendant tried to deceptively obtain a waiver is without merit. Plaintiff's mother received a copy of the document containing the waiver well in advance of the party and had ample opportunity to review it. Defendant made no attempt to disguise the waiver language. The wording of the invitation was sufficiently clear that no one would be permitted to participate in the event without a signed waiver. Therefore, I find that the trial court erred as a matter of law by failing to grant defendant summary disposition on this claim because the MCPA is not an appropriate basis upon which plaintiff can recover.

I would reverse and remand to the trial court for further proceedings consistent with this opinion. I would not retain jurisdiction.

BANDSTRA, P.J. (*concurring*). I concur with the lead opinion's conclusions that the trial court erred by not dismissing plaintiff's claim of gross negligence and that the trial court also improperly failed to dismiss plain-

tiff's claim under the Michigan Consumer Protection Act (MCPA), MCL 445.901 *et seq*. Further, I reluctantly concur with the decision that we cannot enforce the waiver signed by the child's father. However, I think that result is wrong and write separately hoping that either the Michigan Legislature or our Supreme Court will further address the issue.

As the lead opinion's overview of Michigan caselaw illustrates, the rule has long been settled that a parent does not have the authority to release existing claims that a child might have on the basis of events that have already occurred. This "postinjury" rule abrogating parental waivers has been extended to preinjury waivers, such as the one at issue here, by courts of some of our sister states who see little difference between the two contexts. See, e.g., *Cooper v Aspen Skiing Co*, 48 P3d 1229, 1233 (Colo, 2002), quoting *Scott v Pacific West Mountain Resort*, 119 Wash 2d 484, 494; 834 P2d 6 (1992) (" '[S]ince a parent generally may not release a child's cause of action after injury, it makes little, if any, sense to conclude a parent has the authority to release a child's cause of action prior to an injury.' ").

There is no Michigan precedent explicitly discussing whether the postinjury rule against parental waivers should apply in a preinjury case. However, in a case involving a preinjury waiver, our Supreme Court in its analysis of whether that waiver should be enforced, recognized "the common-law rule that a parent has no authority to waive, release, or compromise claims by or against a child." *McKinstry v Valley Obstetrics-Gynecology Clinic, PC*, 428 Mich 167, 192; 405 NW2d 88 (1987). Considering that language to be binding on us, I am constrained to agree with the lead opinion that this result must apply in the matter before us.

Nonetheless, *McKinstry* certainly did not consider the logic of extending the postinjury waiver invalidation rule to preinjury waivers. Further, contrary to those courts that simply see no difference between the two contexts, other courts and commentators have suggested that important differences exist, making extension of the invalidation rule to preinjury cases inappropriate.

"The concerns underlying the judiciary's reluctance to allow parents to dispose of a child's existing claim do not arise in the situation where a parent waives a child's future claim. A parent dealing with an existing claim is simultaneously coping with an injured child; such a situation creates a potential for parental action contrary to that child's ultimate best interests.

"A parent who signs a release before her child participates in a recreational activity, however, faces an entirely different situation. First, such a parent has no financial motivation to sign the release. To the contrary, because a parent must pay for medical care, she risks her financial interests by signing away the right to recover damages. Thus, the parent would better serve her financial interests by refusing to sign the release.

"A parent who dishonestly or maliciously signs a preinjury release in deliberate derogation of his child's best interests also seems unlikely. Presumably parents sign future releases to enable their children to participate in activities that the parents and children believe will be fun or educational. Common sense suggests that while a parent might misjudge or act carelessly in signing a release, he would have no reason to sign with malice aforethought.

"Moreover, parents are less vulnerable to coercion and fraud in a preinjury setting. A parent who contemplates signing a release as a prerequisite to her child's participation in some activity faces none of the emotional trauma and financial pressures that may arise with an existing claim. That parent has time to examine the release, consider its terms, and explore possible alternatives. A parent

signing a future release is thus more able to reasonably assess the possible consequences of waiving the right to sue." [*Zivich v Mentor Soccer Club, Inc*, 82 Ohio St 3d 367, 373; 696 NE2d 201 (1998), quoting Note, Scott v Pacific West Mountain Resort: *Erroneously invalidating parental releases of a minor's future claim*, 68 Wash L R 457, 473-474 (1993).]

These considerations are persuasive and I would conclude that, whatever the merits of abrogating postinjury parental waivers, there is no reason to extend that abrogation to preinjury waivers.

Moreover, to do so further undermines the authority of parents to make judgments and decisions regarding the activities in which their children should participate. As the United States Supreme Court reasoned in *Parham v J R*, 442 US 584, 602; 99 S Ct 2493; 61 L Ed 2d 101 (1979), "[t]he law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions." Thus, a court should be extremely hesitant "to inject itself into the private realm of the family" by questioning the ability of a parent "to make the best decisions concerning the rearing of that parent's children." *Troxel v Granville*, 530 US 57, 68-69; 120 S Ct 2054; 147 L Ed 2d 49 (2000); accord *Sharon v City of Newton*, 437 Mass 99, 108; 769 NE2d 738 (2002) ("[W]ith respect to matters relating to [their children's] care, custody, and upbringing [parents] have a fundamental right to make those decisions for them."). Instead, that parental privilege and authority should be respected by the courts, as it was in *Zivich*:

When Mrs. Zivich signed the release she did so because she wanted Bryan to play soccer. She made an important family decision and she assumed the risk of physical injury on behalf of her child and the financial risk on behalf of the

> family as a whole. Thus, her decision to release a volunteer
> on behalf of her child simply shifted the cost of injury to the
> parents. Apparently, she made a decision that the benefits
> to her child outweighed the risk of physical injury. *Mrs.
> Zivich did her best to protect Bryan's interests and we will
> not disturb her judgment. [Zivich, supra* at 374 (emphasis
> added).]

Similar decisions were made by the child's father here,[1] and we should not undermine them by allowing this lawsuit to proceed.

Finally, I agree with the lead opinion that our decision today has significant and far-reaching implications. As this case amply demonstrates, ours is an extremely and increasingly litigious society.[2] Any entity that provides an educational, recreational, or entertainment opportunity to a minor does so at great risk of having to defend an expensive lawsuit, meritorious or not. To avoid some of that, preinjury waivers have become commonplace. If the law does not honor those waivers, the implications appear inevitable: the cost of providing opportunities will rise, some families who would like their children to participate will no longer be able to afford to, and, ultimately, some opportunities will simply become unavailable altogether. See, e.g., *Hohe v San Diego Unified School Dist*, 224 Cal App 3d 1559, 1564; 274 Cal Rptr 647 (1990) (upholding a parental waiver while noting that the availability of recreational and sports activities for children are steadily decreasing).

Because of the impact of today's decision and the compelling arguments against abrogating preinjury pa-

---

[1] There is no argument that the waiver was unclear or that the child's father did not read and understand it.

[2] Children have routinely jumped off playground slides for generations; lawsuits seeking to impose damages on someone else for resulting injuries are only a recent phenomenon.

rental waivers, I encourage the Michigan Legislature or Supreme Court to further consider the issue.

SCHUETTE, J. (*concurring*). First, I concur with my distinguished colleague, Judge TALBOT, in his lead opinion that plaintiff did not establish that defendant's conduct was grossly negligent, that the Michigan Consumer Protection Act, MCL 445.901 *et seq.*, has no applicability to this case, and that the facts, circumstances, and pleadings of this case do not involve a premises-liability action.

I further concur, although reluctantly, in the conclusion reached by Judge TALBOT that judicial precedent in the state of Michigan requires this reviewing court to invalidate the preinjury waiver of liability signed by the minor child's father in this case. I also strongly share the sentiments expressed in the concurring opinion of my distinguished colleague, Judge BANDSTRA. I write separately to emphasize several issues of extreme legal and policy significance that should be addressed as a consequence of this decision.

Plaintiff's claim concerning the validity of a preinjury, parental waiver of liability for a minor is a newly emerging issue for our courts. As described in Judge TALBOT's thorough lead opinion, courts across the United States are grappling with this issue, and now it is Michigan's turn. I believe that under *McKinstry v Valley Obstetrics-Gynecology Clinic, PC*, 428 Mich 167, 192; 405 NW2d 88 (1987), we are required to invalidate a preinjury, parental waiver of liability to a minor child.

In *McKinstry*, a preinjury waiver case, our Supreme Court determined that a mother could bind her unborn child to arbitration under § 5046(2) of the Medical

Malpractice    Arbitration    Act    (MMAA),    MCL
600.5046(2).[1] Our Supreme Court stated:

> Our interpretation of § 5046(2) is a departure from the
> common-law rule that a parent has no authority to waive,
> release, or compromise claims by or against a child. *Schofield
> v Spilker*, 37 Mich App 33; 194 NW2d 549 (1971); *Reliance
> Ins Co v Haney*, 54 Mich App 237; 220 NW2d 728 (1974); 67A
> CJS, Parent and Child, §114, pp 469-470. However, the
> common law can be modified or abrogated by statute. *Bean v
> McFarland*, 280 Mich 19; 273 NW 332 (1937); *O'Brien v
> Hazelet & Erdal*, 410 Mich 1; 299 NW2d 336 (1980). Thus, a
> child can be bound by a parent's act when a statute grants
> that authority to a parent. *Reliance Ins Co, supra*, p 242;
> *Wilson v Kaiser Foundation Hospitals*, 141 Cal App 3d 891;
> 190 Cal Rptr 649 (1983). We believe that § 5046(2) of the
> MMAA changes the common law to permit a parent to bind a
> child to an arbitration agreement. [*McKinstry, supra* at
> 192-193.]

Some might argue that the above-referenced quo-
tation is dictum and hence not binding on lower
courts in Michigan.[2] Or, some might contend that the
plain meaning and use of the word "claim" by our
Supreme Court in *McKinstry* may only be interpreted to
apply to postinjury waivers, because a claim can only
occur after, not before, an injury has been caused.[3] Yet,

---

[1] MCL 600.5046(2) was repealed by 1993 PA 78, effective October 1, 1993.

[2] Dictum is " ' "judicial comment made during the course of delivering
a judicial opinion, but one that is unnecessary to the decision in the case
and therefore not precedential (though it may be considered persua-
sive)." ' " *Carr v City of Lansing*, 259 Mich App 376, 383-384; 674 NW2d
168 (2003) (citations omitted).

[3] A claim is defined as:

> 1. The aggregate of operative facts giving rise to a right
> enforceable by a court . . . . 2. The assertion of an existing right;
> any right to payment or to an equitable remedy, even if contingent
> or provisional . . . . 3. A demand for money or property to which
> one asserts a right . . . . [Black's Law Dictionary (7th ed), p 240.]

in *McKinstry*, our Supreme Court stated that "the common law can be modified or abrogated by statute," *McKinstry*, *supra* at 192, seemingly implying that, in the absence of a statute to the contrary, Michigan adheres to the common-law rule prohibiting parental waiver of liability in preinjury, as well as postinjury, situations.

The decision in this case is bound to have enormous consequence and profound impact throughout Michigan. Of equal significance will be our Supreme Court's review of this decision, given the dearth of preinjury, parental-waiver-of-liability cases in Michigan and the wide variety of rulings emerging in other jurisdictions throughout the federal and state courts of this nation. See, e.g., *Brooks v Timberline Tours, Inc*, 941 F Supp 959 (D Colo, 1996); *Lantz v Iron Horse Saloon, Inc*, 717 So 2d 590 (Fla App, 1998); *Sharon v City of Newton*, 437 Mass 99; 769 NE2d 738 (2002); *Hojnowski v Vans Skate Park*, 187 NJ 323; 901 A2d 381 (2006); *Zivich v Mentor Soccer Club, Inc*, 82 Ohio St 3d 367; 696 NE2d 201 (1998). Of similar importance is the manner and speed with which the Michigan Legislature responds to this public-policy issue, given the absence of any statute codifying the validity and scope of preinjury, parental waivers of liability for a minor. Most certainly, legislators will come to hear about the impacts of this decision from constituents and interest groups of every competing philosophy and occupation.

Certainly, no one in the Michigan judiciary desires to turn a deaf ear or a blind eye to wayward businesses, dishonorable nonprofit organizations, or volunteer groups that might place a child in a dangerous situation, notwithstanding a parent's executing a release and waiving liability for resulting injury. Equally significant is the fact that an immense amount of youth

activities—church groups, Boy Scouts, sports camps of all kinds, orchestra and theatrical events, and countless school functions—run and operate on release and waiver-of-liability forms for minor children.[4]

Voices will be heard, as this Court heard during oral argument, that no court of law should acquiesce to a piece of paper protecting a business, nonprofit organization, or school group from liability when a child is injured. Equally strong will be the chorus of church, school, and volunteer organizations, and passionate parents, decrying the "chilling effect" of the invalidation of preinjury waivers, freezing out adult volunteers from participating in youth activities and camps of all kinds, with a Sword of Damocles,[5] liability speaking, lurking in the weeds or hanging over their heads.

But in the end, the Michigan Legislature will have to determine whether a statutory exception to the common-law rule for preinjury waivers should be adopted, and whether there should be any differentiation between for-profit and nonprofit groups as some states have seen fit to do. See *Sharon, supra* at 109-110; *Zivich, supra* at 372; *Hohe v San Diego Unified School Dist*, 224 Cal App 3d 1559, 1564; 274 Cal Rptr 647 (1990). I hope that the Michigan Legislature acts thoroughly and promptly.

---

[4] Appended to this opinion are but a few examples of preinjury, parental waivers, which demonstrate their widespread use. Such waivers are used by youth and community organizations, universities, and nonprofit groups for an immense array of activities across Michigan, including: Arcadia Daze 5K Run (Appendix A), SpringHill Summer Camps (Appendix B), Jeff Trickey Quarterback Camps (Appendix C), University of Michigan Gymnastics Camp (Appendix D), Ann Arbor YMCA (Appendix E), Detroit Free Press/Flagstar Marathon (Appendix F), and Wayne State University Mort Harris Recreation and Fitness Center Youth Fitness Camp (Appendix G).

[5] The "Sword of Damocles" was a sword suspended over the head of Damocles in a Greek myth. Wikipedia <http://en.wikipedia.org/wiki/Sword_of_Damocles_%28disambiguation%29> (accessed July 29, 2008).

# APPENDIX A

**ARCADIA DAZE RUN WAIVER**

I know that participating in a foot race is a potentially hazardous activity. I should not enter unless I am medically able. I assume all risks associated with participation in this event, including, but not limited to: falls, contact with other participants, the effect of the weather, traffic, and the condition of the road, with all such risks being known and appreciated by me. Having read the waiver and knowing these facts and in consideration of you accepting my entry, I, for myself and anyone entitled to act on my Behalf, waive and release the Arcadia Lions Club, and all other sponsors, their representatives and successors from all claims or liabilities of any kind arising out of my participation in this event. I grant permission to all of the foregoing to use any photographs, motion pictures, recording, or any other record of this event for any legitimate purpose.

_____
Signature
Parent Signature if under 18 years of age

_____
Date

Sponsored by Arcadia Lions Club and made possible with financial support by BJ Hopwood, Inc., General Contractor.

May copy this form.

## APPENDIX B

SpringHill Summer Camps 2008 Registration Form | g2g! | Please photocopy if you need more than one card.

**FAMILY INFORMATION**

Camper First Name | Camper Last Name | Birth date | Grade Completed (in 9/1500) Gender | Camper Email

Parent or Guardian's Full Name | Spouse's Name | Father Cell Phone | Mother Cell

Street Address | City | State | Zip Code | County

Home Phone | Business Telephone (indicate whose) | Parent Email Address

Confirmations will be sent to the parent email address unless USPS mail is requested here ☐
Camper's previous camp attendance: ☐ Michigan Camp ☐ Indiana Camp ☐ Day Camp ☐ None
Please enter the week and program for your first two choices below

| 1st Choice: ☐ Michigan ☐ Indiana | 2nd Choice: ☐ Michigan ☐ Indiana | TST 1st Choice: ☐ Michigan ☐ Indiana | TST 2nd Choice: ☐ Michigan ☐ Indiana |
| Week ___ | Week ___ | Program Number ___ | Program Number ___ |
| Program ___ | Program ___ | (from Schedule) | (from Schedule) |

Roommate Choices (No more than 3 friends together in one cabin )

Roommate 1 | Roommate Email Address | Roommate 2 | Roommate Email Address

**BILLING INFORMATION**

Please choose one of the following 4 payment options. (U.S dollars only) Your signature authorizes your $150 deposit as well as automatic collection of your balance due on April 21, 2008 using the same payment method. It may take up to 5 days to process

Signature _____ (Without your signature it will not be possible for us to process your registration)
A $150 deposit is required to register; if cancellation is made prior to May 1st, 2008, $75 is non-refundable. Cancellations after May 1st, 2008 up to 21 days prior to camp start date will result in forfeiture of $150. Cancellations within 21 days prior to camp start date will result in forfeiture of one half the cost of camp. No-shows for a scheduled camp will result in forfeiture of the full camp fee.
Cancellation must be requested in writing (mail, email or fax).
Camp Deposit/Fee enclosed or authorized $_____ Spending Money enclosed or authorized. $_____ (Registrations made after April 21 will require full payment)
☐ 1. Electronic transfer from checking account

   Bank Name     Bank Transit/Routing Number     Bank Account Number
☐ 2. Check Enclosed (Your check will be processed as an EFT as well as the remaining balance on April 21, 2008. It may take up to 5 days to process)
   NOTE In an effort to keep camp costs down, we would prefer that you would use a credit/debit card as your last option of payment.
☐ 3/4. Debit/Credit Card ☐ Visa ☐ MasterCard ☐ Discover

   Credit Card Number     Expiration     Name on Card (please print)

**SPECIAL NEEDS?**

Does your camper have any physical, emotional, mental or behavioral challenges which have been professionally diagnosed, or are under evaluation? ☐ Yes ☐ No
Does your camper currently receive special assistance at school? ☐ Yes ☐ No
Does your camper potentially require special attention in order to participate in normal camp activities? ☐ Unsure ☐ Yes ☐ No

Please indicate the severity of all applicable conditions: Additional Information

① Mild ❷ Moderate ❸ Severe

①②③ Allergies | ①②③ Immune Disorder | ①②③ Autism | ①②③ Seizure Disorder | ①②③ ADD/ADHD | ①②③ Asthma
①②③ Bone/Joint/Muscle (MDS/CP/Other) | ①②③ Hearing Impaired | ①②③ Food Allergies ___ | ①②③ Blind/Legally Blind | ①②③ Other ___ | ①②③ Behavior Concerns ___ | ①②③ Emotional Concerns ___

We want to make sure that each child receives the level of attention needed to provide an incredible, inclusive, camp experience. Our staff will contact you if there is concern that your camper's needs may require additional assistance from our staff, or potentially exceed our ability to provide exceptional care to him/her and others

**LIMITED PURPOSE POWER OF ATTORNEY**

I. Consent to Treatment of a Minor

A. By signature below, the undersigned appoints Michael Perry Todd Leinberger, Mt Dinsmore, Craig Soderdahl or Andrew Sate each to act alone or delegate to another person, the power to consent on our behalf to of emergency treatment and/or medical care (except elective surgery) determined necessary or desirable by the attending physician of the hospital

B. This Power of Attorney shall continue unrevoked by the undersigned, or until August 15, 2008, whichever is earlier. Physicians or the hospital's medical staff may assume and rely on this authorization being current and in effect during such period unless notified otherwise.

C. The undersigned certify that they have read this Power of Attorney (or had it read to them), that they understand this Power of Attorney and sign it voluntarily.

II. Release and Indemnity Agreement for SpringHill Participants (Age 17 and under)

By signature below, I certify the following: (1) that my child's participation in SpringHill activities and programs, and my authorization of my child's participation in SpringHill activities and programs, is completely voluntary, and (2) that I have familiarized myself with the SpringHill activities and programs in which my child will be participating I further recognize and have instructed my child in the importance of knowing and abiding by SpringHill's rules, regulations and procedures for the safety of camp participants, and (3) I understand that SpringHill reserves the right to refuse admission to any camper that they feel could be a detriment to any other camper.

I recognize that certain hazards and dangers are inherent in camping and sporting events and in the activities and programs conducted by SpringHill, including, more specifically but not limited to, the activities of horseback riding, swimming, blobbing, rock climbing, zipline, paintball, rappelling and extreme sports I acknowledge that although SpringHill has taken safety measures to minimize the risk of injury to camp participants, SpringHill cannot insure nor guarantee that the participants, equipment premises and/or activities will be free of hazards, accidents and/or injuries Moreover, I understand that participation in any such activities may involve the risk of injury and loss, both to the person and to property, and that the risk may include the possibility of permanent disability or death. I assume all such risks connected with my child's participation in SpringHill activities and programs

I understand that in the unlikely event of a serious illness or injury, every effort will be made to notify the parent or legal guardians at the earliest possible time without jeopardizing the care of the camper or minor staff. Parents or guardians will be notified if their child receives treatment for an injury/illness that require a physician

I understand that there may be elements of risk associated with activities at camp I give permission for my child to participate in all activities at camp and hereby release and agree to indemnify and hold harmless SpringHill and its trustees, officers, employees, agents, and volunteers from any and all claims of any nature arising from such participation.

III. Photo Release

Photographs and video footage of my child as a result of participation in activities at SpringHill may be used in SpringHill's promotional materials or website

Date Month _____ Day _____ , 2008

Parent or Guardian's Legal Signature _____ (Signature required for admittance into Summer Camp)

APPENDIX C

# Jeff Trickey Quarterback Camps
## 2008 QUARTERBACK CAMP APPLICATION FORM

My son has my permission to attend the JEFF TRICKEY QB CAMP. I certify that within the past two years, he has had a physical examination and that now, he is physically able to participate in football camp activities without restriction. In the event of an illness or injury, I give my consent for medical treatment and

permission to attending physician to hospitalize, secure proper treatment, and order injections, anesthesia, or surgery. I will be responsible for any medical or other charges in connection with my son's attendance in camp.

I acknowledge that at the JEFF TRICKEY QB CAMP my son will participate in a sport that may involve, among other things, physical contact of the body with other persons or objects, including the ground, and that at the JEFF TRICKEY QB CAMP, he may incur a risk of injury. I specifically waive, give up and release the JEFF TRICKEY QB CAMP and staff from liability for any claim for damages which I or my son may have for injuries or illness that he may sustain at camp.

Camper Signature:_____

Parent's Signature:_____

**NO PLAYER WILL BE ACCEPTED
WITHOUT PARENTAL APPROVAL**

APPENDIX D

## Important Michigan Gymnastics Camp Information:

Parent/Guardian Consent, Medical Release and Release from Liability Agreement

*Please read the following information carefully before signing.*
All blanks must be completed. Please read the following information carefully before signing.

Activity: _____ Activity Time Period: _____

Activity Sponsor: _____

Participant Name: _____

Parent/Guardian Name(s): _____

In consideration for allowing Participant to participate in Activity, I/we, as parents and/or guardians of Participant, agree to the following:

Authorize Participant to participate in the Activity for the Activity Time Period stated above.

Release, indemnify and hold harmless the Activity Sponsor and University from any and all damages, except for damages caused by the sole gross negligence or intentional misconduct of Activity Sponsor or University, arising out of the participation of Participant in the Activity.

Prior to the commencement of the Activity, I/we were made aware of the nature of the Activity, had sufficient opportunity to inquire further, and understand the Activity has inherent risks and I/we and Participant assume, on behalf of Participant, all those inherent risks.

While participating in the Activity, Participant is subject to the policies, rules and regulations of the University and Activity Sponsor. Possession of fireworks, explosives, any weapon, illegal drugs or alcohol is prohibited and cause for immediate expulsion from the Activity. Further, any Participant repeatedly disobeying University or Activity Sponsor policies, rules or regulations may be expelled from the Activity.

Authorize Activity Sponsor, its employees, clinicians, trainers, nurses and agents (collectively, "Activity Sponsor") the authority to seek, obtain, and approve any medical care and treatment including, but not limited to x-ray examination, anesthetic, medical, dental or surgical diagnosis, or treatment and medical care which may be recommended and provided under the general supervision of any physician or surgeon, for Participant which, in their judgment, is necessary for the health and well-being of Participant during his/her participation in the Activity. I/We further agree that I/we are(am) solely responsible for any costs incurred and agree to hold the Activity Sponsor and the Regents of the University of Michigan, their employees and agents (collectively, "University") harmless for any liability arising out of any good faith action taken in obtaining medical treatment for Participant.

The above agreements are binding upon us, our estates, heirs, representatives and assigns.

Parent/Guardian Signature _____    Date _____

Parent/Guardian Signature _____    Date _____

Participant Signature _____    Date _____

## APPENDIX E

### Ann Arbor YMCA School Age
### Permission Form

**FIELD TRIP/TRANSPORTATION PERMISSION**
I give permission for my child ___ _____, to be transported by the Ann Arbor YMCA from his/her school to the YMCA on the days he/she is registered to attend. I give permission for my child to go on any field trips supervised by the Ann Arbor YMCA Child Care Staff. I understand that many trips consist of short walks to nearby locations. I understand further that I will be notified in advance about any longer trips and that, if any vehicle is used to transport my child, each child will be required to wear a seat belt or be placed in a car seat that I would provide.

Parent/Guardian Signature_____    Date_____

**PHOTOGRAPHY AND RECORDING PERMISSION**
I hereby irrevocably release, consent and allow the Ann Arbor YMCA and its agents to use my child's photograph/likeness/voice, as it pertains to participation with the YMCA, in any manner for promotional efforts without expectation of any reimbursement in connection with its use.

Parent/Guardian Signature_____    Date_____

**LIABILITY**
I understand the physical activities which my child may participate in at the YMCA include, but may not be limited to: swimming, running, playing and sports. I agree to assume all liability and release the YMCA from any liability for the risk of injury, illness or death on account of my child's presence in a YMCA facility or on account of my child's involvement in any activity at a YMCA facility or at the sponsored activity.

Parent/Guardian Signature _____ Date _____

**SWIMMING**
I give permission for my child_____, to participate in the YMCA Youth Aquatics Program. A kindergartner or school-aged child may participate in youth recreation swim when available.

Parent/Guardian Signature_____    Date_____

**SUNSCREEN/BUG SPRAY**
My child (circle one)   should   should not   wear sunscreen while being outdoors. Please apply first application at home. Sunscreen should be supplied by you, the parent. I understand that selecting "should" allows staff to apply sunscreen to my child. This does not guarantee application.

My child (circle one)   should   should not   wear bug spray while being outdoors. Please apply first application at home. Bug spray should be supplied by you, the parent. I understand that selecting "should" allows staff to apply bug spray to my child. This does not guarantee application.

Parent/Guardian Signature_____   Date_____

**PHYSICAL HEALTH**
I hereby attest that my child_____is in good health. Further more any activity restrictions, allergies, medications taken by the child, or any other needs are listed in the Child Information Record. Immunization records or appropriate waivers are up to date and on file with my child's school.

Parent/Guardian Signature_____    Date_____

## APPENDIX F

**Detroit Free Press/Flagstar Marathon:** - October 19, 2008
*Registration Fees | Registration Form*

**Release:**

In consideration of your accepting this entry, I
hereby, for myself, my heirs, executors and
administrators, waive and release any and all rights
and claims for liability and damages I may have
against the Detroit Free Press/Flagstar Marathon
("Marathon"), its employees, agents, officers,
governors, sponsors and volunteers, Detroit Free
Press, Inc., Flagstar, Detroit Newspaper Partnership
the Cities of Detroit and Windsor, USA Track and

Printable Release

Name of Parent/Guardian:
*required if participant is under 18*
*By entering my name above, I represent that I, as a valid parent/guardian,*
*am completing this form and agree to the above waiver/release.*

**Detroit Free Press/Flagstar Marathon Waiver/Release**

In consideration of your accepting this entry, I hereby, for myself, my heirs, executors and administrators, waive and release any and all rights and claims for liability and damages I may have against the Detroit Free Press/Flagstar Marathon ("Marathon"), its employees, agents, officers, governors, sponsors and volunteers, Detroit Free Press, Inc., Flagstar, Detroit Newspaper Partnership, the Cities of Detroit and Windsor, USA Track and Field, and their representatives, successors and assigns, for any and all injuries or death suffered by me in or arising from said event. I acknowledge that it is my responsibility to understand the risks and determine whether I am fit to safely complete this event and the precautions I should take. I attest and certify that my physical condition and ability to safely complete this event have been verified by a licensed medical doctor (except where the latter is in violation of religious principles); and that I am physically fit and have sufficiently trained to complete this and future competitions. I grant to the Marathon and its sponsors and licensees the exclusive right to the free use of my name, voice and/or picture in any broadcast, telecast, advertising, promotion or other account of this event. I acknowledge that my entry fee is non-refundable and non-transferable, even if the race is cancelled. I agree that any legal claim or dispute arising out of or in any way relating to my participation in this event will be governed by the laws of Michigan and will be adjudicated exclusively by and in the Courts of Michigan.

The registrant acknowledges that MarathonGuide.com/Web Marketing Associates has no responsibility for the operation of the Detroit Free Press/Flagstar Marathon and associated events and is only acting as an agent to register applicants who wish to participate in the Detroit Free Press/Flagstar Marathon and associated events. Accordingly, the registrant agrees to hold MarathonGuide.com/Web Marketing Associates and its agents harmless from any liability or injury resulting from the Detroit Free Press/Flagstar Marathon and associated events. Furthermore, the registrant agrees that it shall have no claim against MarathonGuide.com/Web Marketing Associates for any injury that may occur during the Detroit Free Press/Flagstar Marathon and associated events. The individual event operators and sponsors have provided information included in this site and MarathonGuide.com/Web Marketing Associates does not verify the accuracy or completeness thereof. All confirmed orders are final once payment is submitted. MarathonGuide.com/Web Marketing Associates does not issue refunds.

APPENDIX G

## 2008
## Mort Harris Recreation and Fitness Center
# Summer
# Kids'
# Camp

### New Camp Format
4-6 yrs. and 7-10 yrs. Groups!

Wayne State University
5210 Gullen Mall
Detroit, MI 48202
313-577-2348
www.rfc.wayne.edu

WAIVER AND RELEASE STATEMENT. All exercise and participation is done at the risk of the participant (s). Wayne State University, its employees and agents are not liable for personal injury. By signing this form, I am releasing Wayne State University, its employees and agents from any and all claims for injuries, including bodily injury, damages and property loss the participant (s) might sustain through participation in any Wayne State University Recreation and Fitness Center programs. I understand that it is my responsibility to obtain medical clearance for the participant (s) if necessary and that I will be personally responsible for the cost of any medical expenses incurred by the participant (s) as a result of participating in any Recreation and Fitness Center activities. This Waiver and Release is binding on my and the participant's heirs, administrators, executors, successors and assigns. In the event that the participants (s) require emergency treatment and neither I nor the designed emergency contact can be reached, then I consent to the provision of emergency treatment by a licensed physician or hospital. I have read and understand this paragraph. I gave Wayne State University, its employees and agents the irrevocable right to use my child's, picture, portrait, or photograph in all forms and media and in all manners, including composite, for advertising, for publication or any other lawful purposes, and I waive any right to inspect or approve the finished product, including written copy, which may be created in connection herewith.

_____    _____
Signature                           Date

_____
Printed Name