Martha M. BROOKS and D. Gregory Brooks, Plaintiffs,

v.

TIMBERLINE TOURS, INC., a Colorado corporation, a/k/a Timberline Tours, Inc., d/b/a Kelchner Enterprises, Inc., Gregory A. Kelchner, d/b/a Timberline Tours, Ted A. Keleske, and Michael A. Van Luven, Defendants.

Civil Action No. 95–B–115.

United States District Court, D. Colorado.

Oct. 3, 1996.

**960**

Cuba Y. Holloway, Gerald R. Blixt, Bennett and Hollaway, Colorado Springs, CO, for Plaintiffs.

R. Eric Peterson, Monty L. Barnett, White and Steele, P.C., Denver, CO, for Defendants.

## MEMORANDUM OPINION AND ORDER

BABCOCK, District Judge.

In this diversity action, defendants, Timberline Tours, Inc., a Colorado corporation, a/k/a Timberline Tours, Inc., d/b/a Kelchner Enterprises, Inc., Gregory A. Kelchner, d/b/a Timberline Tours, Ted A. Keleske and Michael A. Van Luven (collectively, defendants) move for summary judgment on the claims of plaintiffs, Martha M. Brooks and D. Gregory Brooks (the Brooks). After consideration of the motion, briefs, and oral argument, I will grant defendants' motion for summary judg-ment. Plaintiff's cross-motion for summary judgment is denied.

## I.

Unless otherwise noted, the following facts are undisputed. On January 20, 1993, Martha Brooks was injured and the Brooks' minor son Andrew was killed in a snowmobile accident. The Brooks family were participants in a guided snowmobile tour conducted by Timberline Tours. Defendant Michael A. Van Luven (Van Luven), an employee of Timberline Tours, was the guide assigned to lead plaintiffs' snowmobile tour.

Before leaving on the tour, the Brooks signed agreements (the Agreement) which included a paragraph titled "RELEASE" (the Release) that provides in part:

> I hereby voluntarily release Timberline Tours, Inc., . . . their agents or employees, and all other persons or entities from *any and all liability, claims, demands, actions or rights of action, which are related to or are in any way connected with my participation in this activity,* including specifically *but not limited to* the negligent acts or omissions of Timberline Tours, Inc., . . . their agents or employees, and all other persons or entities, for any injury, death and damage to myself or to my property . . . (emphasis supplied).

> I further agree, promise and covenant *not to sue, assert or otherwise maintain or assert any claim* against Timberline Tours, Inc., . . ., their agents or employees, and all other persons or entities, for any injury, death or damage to myself or to my property, *arising from or connected with my participation in this activity* . . . (emphasis supplied). IN SIGNING THIS DOCUMENT, I FULLY RECOGNIZE THAT IF ANYONE IS HURT OR PROPERTY IS DAMAGED WHILE I AM ENGAGED IN THIS EVENT, I WILL HAVE NO RIGHT TO MAKE A CLAIM OR FILE A LAWSUIT AGAINST TIMBERLINE TOURS, INC., . . . OR THEIR OFFICERS, AGENTS, OR EMPLOYEES, EVEN IF THEY OR ANY OF THEM NEGLIGENTLY CAUSE

THE BODILY INJURY OR PROPERTY DAMAGE.... (emphasis in originals).

Exhs. F, G, H.

There is no dispute that each Agreement contains either Mr. or Mrs. Brooks' signature individually or on behalf of their minor son.

After some preliminary instruction, the group, including the Brooks family, led by tour guide Van Luven, started up the mountain from the base camp on their snowmobiles. Andrew Brooks, 2 months short of his fourteenth birthday, was operating one snowmobile with his mother as his passenger. Mr. Brooks was driving another snowmobile. Shortly after the tour started, approximately one mile from the base camp, the snowmobile driven by Andrew with his mother riding as passenger ended up off the packed trail in deep snow on the right uphill side of the trail. Def. Motion for SJ p. 2; Miranda Aff. ¶ 5. It is disputed whether Andrew's snowmobile was stopped in the snow or moving along in the ditch on the right side of the trail. (Keleske Depo. p. 71; Miranda Aff. ¶ 5). In either event, while the snowmobile was off the trail, it then turned sharply to the left, crossed the packed trail and went over a steep embankment on the left side of the road coming to a stop some 450 feet down the embankment. Martha Brooks was seriously injured in the accident and Andrew Brooks died several hours later from the injuries he sustained.

Plaintiffs concede that they have no personal knowledge about the events immediately before or during the accident. Mrs. Brooks has no recollection of events after she left the base camp and Mr. Brooks was ahead on the trail out of sight of his wife and son when the accident occurred. Plaintiffs' Brief p. 5. However, plaintiffs proffer testimony from several persons that shortly after the tour began, tour guide Van Luven who was ahead of everyone in his group, speeded up and was out of sight of Andrew and his mother when the accident occurred. Mr. Brooks testified that Van Luven "was going at a very rapid rate of speed ..." and he had to occasionally "gun it to try to catch up with [Van Luven]." D.G. Brooks Depo. p. 68. Another member of the Brooks' group submitted an affidavit in which he states that "when the trip started, [the group] proceeded up a relatively steep incline ... traveling in excess of thirty (30) miles per hour ... up to thirty-five (35) miles per hour." Allen Aff. ¶ 12. Van Luven testified, however, that he was going "15, 20 miles an hour—normal speed." Van Luven Depo. p. 28. Allen also swears that "Andrew Brooks and his mother fell behind because the guide at the front of the group traveled at a speed clearly not suited for inexperienced operators. It appeared our guide at the front of our group was trying to drive as fast as he could.... [The] guide never looked back to observe the significant distance between the various members of our group." Id. at ¶ 14. Also, when Van Luven stopped, Andrew and his mother were out of his sight. Id.

In the meantime, defendant Keleske, the tour guide for the snowmobile tour group following the Brooks' group, testified that when he noticed the Brooks snowmobile in the deeper snow on the right, he pulled alongside them to get their attention and to give them a focal point to get back onto the groomed portion of the road. Exh. E. p. 68–69. When Keleske could not get Andrew and Mrs. Brooks' attention, he pulled ahead of them and stopped in the middle of the road. When he turned around, they had disappeared down the embankment. Exh. E. p. 105–06. According to Keleske, he passed them and stopped so that he could tell them to get back on the packed portion of the road and keep up with their group. Exh. E. p. 105. Keleske's testimony is undisputed.

## II.

### SUMMARY JUDGMENT STANDARD

The very purpose of a summary judgment motion is to assess whether a trial is necessary. *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir.1995). Fed.R.Civ.P. 56 provides that summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The non-moving party has the burden of showing that there are issues of material

fact to be determined. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, interrogatories, and admissions on file together with affidavits, if any, which it believes demonstrate the absence of genuine issues for trial. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552–53; *Mares v. ConAgra Poultry Co., Inc.,* 971 F.2d 492, 494 (10th Cir.1992). Once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried. *Otteson v. U.S.,* 622 F.2d 516, 519 (10th Cir.1980); Fed.R.Civ.P. 56(e).

### III.

The parties have filed cross-motions for summary judgment contesting whether the Release sections contained in the Agreements are valid and, if valid, whether they apply to the facts of this case.

#### A. *Validity of the Release sections*

In this diversity action, the resolution of the summary judgment motions turns on the application of Colorado law. *Day v. Snowmass Stables, Inc.,* 810 F.Supp. 289 (D.Colo.1993). The determination of the sufficiency and validity of an exculpatory agreement is a question of law for the court to determine. *Jones v. Dressel,* 623 P.2d 370, 375 (Colo.1981).

Exculpatory agreements have long been disfavored. *Heil Valley Ranch, Inc. v. Simkin,* 784 P.2d 781 (Colo.1989). Also, they are strictly construed against the drafter because of their one-sidedness. *Rosen v. LTV Recreational Development, Inc.,* 569 F.2d 1117, 1122 (10th Cir.1978).

"In determining whether an exculpatory agreement is valid, there are four factors which a court must consider: 1) the existence of a duty to the public; 2) the nature of the service performed; 3) whether the contract was fairly entered into; and 4)

whether the intention of the parties is expressed in clear and unambiguous language." *Id.* at 376.

A duty to the public contemplates a party " 'engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public.' " *Id. quoting Tunkl v. Regents of University of California,* 60 Cal.2d 92, 32 Cal.Rptr. 33, 36, 383 P.2d 441, 444 (1963). Providing snowmobile tours to the public does not fall within this category. Here, as in *Jones v. Dressel* (no public duty in allowing use of skydiving facilities), the injuries sustained by the Brooks occurred while they were participating in a recreational activity. "[B]y definition and common sense, [snowmobiling] is neither a matter of great public importance nor a matter of practical necessity." *Potter v. National Handicapped Sports,* 849 F.Supp. 1407, 1409 (D.Colo.1994) (no public duty in providing handicapped skiing program). Therefore, there is no public duty that prevents enforcement of these agreements.

Plaintiffs next contend that the language contained in the Release sections of the Agreements is unclear and ambiguous rendering the Agreements invalid. I disagree. The relevant inquiry is whether the "intent of the parties was to extinguish liability and whether this intent was clearly and unambiguously expressed." *Heil Valley Ranch, Inc. v. Simkin,* 784 P.2d 781, 785 (Colo.1989).

In this case, the Release provisions of the Agreements were written in simple, clear terms, and are not inordinately long or complicated. Each Agreement used the term "negligence" at least four times and excluded specifically "any and all liability, claims, demands, actions, or rights of action, which are related to or are in any way connected with [plaintiffs'] participation in this activity [snowmobiling]." Exh. F, G, H. Moreover, the second paragraph of the Release section was printed in capital letters, highlighting the importance of the information contained in it. Accordingly, I conclude that the exculpatory clause is valid.

B. *Breach of contract claim*

Plaintiffs assert that defendants had a contractual duty to provide a guide and a safe snowmobile tour. They contend that "even if the exculpatory agreements were valid when signed, Defendants cannot assert them now because [they] caused a material breach in the underlying agreement, which required Defendants to provide a guide and furnish Plaintiffs ... with a safe tour." Pltf. Resp. to S.J. Mtn. p. 17–18. Plaintiffs proffer no tour contract. Rather, they point to an advertising brochure (Exh. A), Guide Manual (Exh. M), and Timberline Tour's letter of agreement with Climax Moly Mines (Exh. N) in an attempt to cobble together the "underlying agreement."

The "Release" portion of the Agreements state, in pertinent part, that the signer "voluntarily release[s] Timberline Tours, Inc., ... their agents or employees from *any and all liability [and] claims ... including specifically but not limited to the negligent acts* ... of Timberline Tours, Inc...." Also, the signer agreed "not to sue, assert or otherwise maintain or assert *any claim* against Timberline Tours, Inc. their agents or employees ..." In addition, the last full paragraph above the signature line stated:

> I understand that this is the *entire Agreement* between myself and Timberline Tours, Inc., ..., their agents or employees, *and that it cannot be modified or changed in any way be the representations or statements of any employee or agent of Timberline Tours, Inc., ..., or by me.*

Exhs. F, G, H. (emphasis supplied).

This language is simple, unequivocal, and unambiguous. Thus, I conclude, as a matter of law, that there was no "underlying agreement" upon which plaintiffs could base a breach of contract claim.

Plaintiffs reliance on *Suttenberg v. Lofblad,* No. 91–B–374 (D.Colo. 10/2/91), where the plaintiff's claims survived because of a genuine dispute as to breach of contract, is misplaced for two reasons. First, unlike the Agreements in this case, the *Suttenberg* agreement, titled "Tour and Lease Agreement," not only contained an equipment lease and exculpatory clause but also a tour agreement in which the defendants agreed to "conduct ... a snowmobile tour ... and to provide trained personnel to act as snowmobile tour guides." *Suttenberg,* p. 2. Also, there was a genuine dispute about whether the *Suttenberg* tour guide abandoned the tour group by riding farther and farther away at a speed that Suttenberg could not match. Long after the tour guide was out of sight, Suttenberg attempted to maneuver past a tree, flew off of the snowmobile and struck the tree. *Suttenberg,* at p. 2.

Here, the Brooks' guide, Van Luven, out in front of his group, was around a bend in the road and could not see Andrew who was last in line. It is undisputed, however, that tour guide Keleske, leading his own tour group, was riding behind Andrew. Keleske not only had Andrew in sight before the accident but he also attempted to get Andrew back on track. Under these circumstances, even if there had been an agreement to provide a safe and guided tour, I could not conclude, as a matter of law, that defendants abandoned Andrew and Mrs. Brooks. And, perhaps most importantly, the Releases in this case broadly encompass not only claims for negligence but any claim based on a breach of contract theory.

Accordingly, it is ORDERED that:

1. defendants' motion for summary judgment is GRANTED on all claims;

2. plaintiffs' cross-motion for summary judgment is DENIED; and

3. defendants are awarded costs.