51 A.3d 100

Russell ROSEN, Individually, etc., et al.

v.

BJ'S WHOLESALE CLUB, INC.

No. 2861, Sept. Term, 2009.

Court of Special Appeals of Maryland.

Aug. 30, 2012.

710

Denis C. Mitchell (Ari S. Casper, Kerrie C. Dent, Stein, Mitchell & Muse, LLP, on the brief) Washington, D.C., for appellant.

Christopher R. Dunn (DeCaro, Doran, Siciliano, Gallagher & DeBalasis, LLP, on the brief) Bowie, MD, for appellee.

Panel: KRAUSER, C.J., WOODWARD and KEHOE, JJ.

KRAUSER, C.J.

BJ's Wholesale Club, Inc., appellee, is a self-described "membership warehouse club." Among other things, it purports to offer its members "brand-name" products at relatively low prices.[1] To be a member, an interested party must pay an annual membership fee.

BJ's Wholesale provides a play center for the children of its members while its members shop. But, before a member's child may have access to the play center, the member must execute a release agreement. The agreement, in addition to setting forth rules for the use of the club, ostensibly releases BJ's Wholesale from "any and all claims and causes of action" arising from the use of the play center by a member's child and requires a member to "indemnify, defend and hold harmless" BJ's Wholesale from any such claims or causes of action.

As a member of BJ's Wholesale, Russell Rosen executed one of BJ's release agreements in July 2005. A little more than fifteen months later, on October 22, 2006, Mr. Rosen's wife, Beily Rosen, entrusted the Rosens' five-year-old son, Ephraim, to the play center, upon entering BJ's to shop. While playing there, Ephraim fell head first from "an elevated plastic play apparatus," suffering a serious brain injury.

The Rosens thereafter brought a negligence action, on behalf of Ephraim and themselves, in the Circuit Court for Baltimore County, against BJ's Wholesale. In turn, BJ's filed

---

1. BJ's claims, on its website, that its "Everyday Low Prices" can save its members "more than 30% off supermarket prices." *See* http://www. bjs.com/biz/help.content.help.E (last visited Aug. 3, 2012).

a counterclaim against the Rosens, alleging breach of the release agreement Mr. Rosen had signed, and later a motion for summary judgment invoking the same agreement. The circuit court granted summary judgment in favor of BJ's Wholesale, concluding that the release agreement was valid and enforceable. Claiming that it is neither, the Rosens noted this appeal.

Because we hold that a parent may not waive by agreement a minor child's future claim in negligence against what we shall refer to as a "commercial enterprise"—that is, a for-profit, commercial entity that principally serves private interests [2]—we reverse the judgment below. We further hold that the release's indemnification clause is also unenforceable, because implementation of that clause under the circumstances of this case would obviate the very public policy considerations that underlie our conclusion that the exculpatory clause of the release agreement is both invalid and unenforceable.

## Background

BJ's Wholesale, a Fortune 500 corporation, operates a chain of "membership-only" warehouse stores in the eastern United States. Russell and Beily Rosen were members and shopped at the BJ's store in Owings Mills, Maryland. As a courtesy to its members, BJ's offers, at its stores, a free, supervised children's play center, which BJ's calls the "Incredible Kid's Club." But a member's children may not use the play center, unless the member signs a release, containing exculpatory and indemnification clauses, as well as rules that must be followed to use the play center. The rules speak to address such things as the minimum and maximum ages of a child using the center, the maximum length of time a child may remain at the play center on a single visit, the responsibility of parents to pick up their children and to answer the store's paging promptly, a prohibition against sick children using the play center, and so on.

---

**2.** We concede that this definition of "commercial enterprise" is a stipulative and not a lexical definition of that term.

At the bottom of the single-page document, in bold print, but what appears to be eight-point type, are exculpatory and indemnification provisions which are the subject of this appeal.[3] There, the document states:

> I hereby acknowledge that the participation in BJ's Incredible Kid's Club (the "Play Center") is a benefit offered to me as a part of my BJ's Wholesale Club membership. I further acknowledge that I have read, understood and I voluntarily agree to abide by all of the rules appearing above and/or rules as posted in the Play Center and registration area. In consideration for this service, I, individually and on behalf of my child, do hereby waive, release and forever discharge BJ's Wholesale Club, Inc., its subsidiaries and affiliates and their respective agents, employees, officers, directors, shareholders, successors and assigns from any and all claims and causes of action of any kind or nature which are in any way related, directly or indirectly, to the use of Play Center which I may have or that hereafter may accrue including any such claims or causes of action caused in whole or in part by the negligence of BJ's Wholesale Club, Inc., its subsidiaries and affiliates, and their respective agents, employees, officers, directors, successors and assigns. I understand that my child is here at my own risk and expense and agree that neither I nor my child will bring any claim or cause of action of any kind or nature against BJ's Wholesale Club, Inc., its subsidiaries and affiliates and their respective agents, employees, officers, directors, successors and assigns. I further agree to indemnify, defend and hold harmless BJ's Wholesale Club, Inc., its subsidiaries and affiliates and their respective agents, employees, officers, directors, successors and assigns from any claims or causes of action of any kind arising from my or my child's use of the Play Center. By placing my signature below, I

---

3. Tempted as we are to reproduce those sections in eight-point type so that readers may see the form in which they were presented to Mr. Rosen, to avoid the ocular strain that would surely follow, we shall resist that inclination and present those sections in our usual thirteen-point type.

acknowledge and agree that I have read this agreement, understood all of the terms and conditions contained herein, and that this agreement will be in full force and effect during each of my or my child's visit [sic] to the Play Center. This agreement shall remain in full force and effect at all times whether my child is dropped off at the Play Center by me or any one else.

On July 17, 2005, Russell Rosen signed this agreement. About fifteen months later, Beily Rosen took her five-year-old son Ephraim to the BJ's Wholesale store in Owings Mills, Maryland. Upon entering the store, she dropped Ephraim off at the play center. While Mrs. Rosen was shopping in BJ's, Ephraim climbed onto "an elevated plastic play apparatus known as Harry the Hippo" at the play center and then fell approximately thirty-eight inches before striking his head on the floor below. Although "most of" the concrete floor of the play center was covered with thick foam padding, Ephraim landed on a section of floor, which was covered by only a thin layer of carpet. Landing head first, he sustained life threatening injuries.

Ephraim was promptly transported to Sinai Hospital in Baltimore, where a CT[4] scan revealed that he had suffered a large, acute epidural hematoma in the right temporal lobe of his brain. He was then transported to Johns Hopkins Hospital, where he underwent a craniectomy[5] to relieve the fluid buildup in his brain.

Ultimately, Russell and Beily Rosen, individually and as parents and next friends of Ephraim, brought a negligence action in the Baltimore County circuit court against BJ's Wholesale, prompting BJ's Wholesale to file in response a

**4.** "CT" is an abbreviation for "computed tomography," that is, the "imaging of anatomic information from a cross-sectional plane of the body, each image generated by a computer synthesis of x-ray transmission data obtained in many different directions in a given plane." STEDMAN'S MEDICAL DICTIONARY 1996 (28th ed.2006).

**5.** A craniectomy is an "[e]xcision of a portion of the skull, without replacement of the bone." STEDMAN'S MEDICAL DICTIONARY 454.

counterclaim, alleging breach of the release agreement signed by Mr. Rosen. When BJ's later moved for summary judgment, invoking that agreement, the circuit court granted the motion. In so doing, it observed that, under Maryland law, exculpatory agreements executed by adults on their own behalf are enforceable and that there has been no articulation of public policy enforcement of such an agreement executed by a parent of a minor child. From that judgment, the Rosens noted this appeal.

## Discussion

This appeal presents a legal question of first impression in Maryland, that is, whether a release of liability, presented by a "commercial enterprise," as previously defined, and executed by a parent, on behalf of a minor child and before the child has sustained any injury, is enforceable. The Rosens contend that it is not, as a matter of public policy. The same is true, they maintain, as to the indemnification clause of the release agreement, since to rule otherwise would, according to the Rosens, obviate the very public policy that renders the exculpatory clause of the same agreement unenforceable.

■ The Rosens' starting point is the settled proposition that, although "[i]n the absence of legislation to the contrary, exculpatory clauses are generally valid," "[t]here are circumstances ... under which the public interest will not permit an exculpatory clause in a contract[.]" *Wolf v. Ford*, 335 Md. 525, 531, 644 A.2d 522 (1994). The *Wolf* Court enumerated three public policy exceptions to the general rule favoring enforceability of exculpatory agreements: (1) "a party will not be permitted to excuse its liability for intentional harms or for the more extreme forms of negligence, i.e., reckless, wanton, or gross"; (2) "the contract cannot be the product of grossly unequal bargaining power"; and (3) "public policy will not permit exculpatory agreements in transactions affecting the public interest." *Id.* at 531–32, 644 A.2d 522.

■ The "ultimate determination of what constitutes the public interest," the Court of Appeals has said, "must be made

considering the totality of the circumstances of any given case against the backdrop of current societal expectations." *Id.* at 535, 644 A.2d 522. Such a backdrop may be found, the Rosens claim, in the Maryland Code [6] and in Maryland common law,[7]

---

**6.** The Rosens list the following statutes, supporting their contention that Maryland public policy "strongly favor[s] protection of children and [their] tort claims":

(1) Md.Code (1974, 2006 Repl.Vol.), § 5–201 of the Courts & Judicial Proceedings Article ("CJ"), which tolls the statute of limitations for minors;

(2) Md.Code (1974, 2001 Repl.Vol., 2010 Supp.), §§ 13–401 through 13–407 of the Estates & Trusts Article ("ET"), which provide for court control over a minor's recovery in tort (including power to appoint a guardian of the property and withhold distribution of any such proceeds until minor reaches age eighteen);

(3) Md.Code (1984, 2006 Repl.Vol.), § 8–103(a) of the Family Law Article ("FL"), which provides, "The court may modify any provision of a deed, agreement, or settlement with respect to the care, custody, education, or support of any minor child of the spouses, if the modification would be in the best interests of the child";

(4) CJ § 10–910, which provides, "In an action on behalf of an infant to recover for death, personal injury, or property damage the negligence of the parent or custodian of the infant may not be imputed to the infant."; and

(5) FL § 5–571(a)(1), which, in the context of State regulation of child care centers, provides as follows: "The General Assembly finds that: (i) a child is not capable of self protection; and (ii) if care of a child is given over to another, mental and physical risks arise that need to be offset by reasonable protective measures."

**7.** The Rosens cite the following common law doctrines and holdings that, they maintain, bolster their contention that Maryland public policy strongly favors "protecting children and their rights to financial support and appropriate compensation":

(1) prohibition against bargaining away the duty to support minor children, *Stambaugh v. Child Support Enforcement Admin.,* 323 Md. 106, 111, 591 A.2d 501 (1991); *Geramifar v. Geramifar,* 113 Md.App. 495, 503, 688 A.2d 475 (1997); *Lieberman v. Lieberman,* 81 Md.App. 575, 588, 568 A.2d 1157 (1990);

(2) a minor's contracts are voidable, *Schmidt v. Prince George's Hospital,* 366 Md. 535, 553–54, 784 A.2d 1112 (2001);

(3) imputation of contributory negligence to minors is, generally, narrowly circumscribed, and it may not be imputed at all to children under age five, *Taylor v. Armiger,* 277 Md. 638, 648–50, 358 A.2d 883 (1976);

(4) parents' ability to waive their child's patient/psychologist privilege is greatly restricted, *McCormack v. Bd. of Educ. of Balt. County,* 158 Md.App. 292, 310–12, 857 A.2d 159 (2004); and

which, they point out, reflect a substantial public interest in protecting children and their rights to seek redress for negligence, when that negligence results in injury to them. We agree and add that the public interest in favor of protecting the claims of children carries additional weight where the tortfeasor is a "commercial enterprise," for the reasons outlined in the discussion that follows.

BJ's release agreement contains, as noted earlier, both an exculpatory and an indemnification clause. An exculpatory clause "absolve[s] [a party] from liability for its future negligence," *Adloo v. H.T. Brown Real Estate, Inc.*, 344 Md. 254, 257, 686 A.2d 298 (1996), by "deny[ing] an injured party the right to recover damages from the person negligently causing the injury," *Scott v. Pacific West Mountain Resort*, 119 Wash.2d 484, 491, 834 P.2d 6 (1992), while an indemnification clause "attempts to shift responsibility for the payment of damages to someone other than the negligent party, usually back to the injured party," thereby "producing the same result as an exculpatory clause." *Id.* We begin with the exculpatory clause.

## I.

The central issue in this case is whether a parent may waive any and all future tort claims his or her child may have against a "commercial enterprise." As to this question, Maryland case law provides little guidance. Neither this Court nor the Court of Appeals has addressed whether a release signed by a parent waiving any and all future claims that his or her child may have against such an entity is enforceable.

That, of course, is not the case where an adult signs an agreement, releasing others from any future claims he or she may have against them. *Wolf v. Ford, supra*, 335 Md. 525,

---

(5) a parent "cannot consent to the participation of a child or other person under legal disability in nontherapeutic research or studies in which there is any risk of injury or damage to the health of the subject," *Grimes v. Kennedy Krieger Inst., Inc.*, 366 Md. 29, 113, 782 A.2d 807 (2001).

644 A.2d 522 (clause in contract signed by eighteen-year-old, which waived any future claims against securities investment firm for trading losses resulting from the firm's negligence, held valid and enforceable); *Seigneur v. Nat'l Fitness Inst., Inc.,* 132 Md.App. 271, 752 A.2d 631 (2000) (pre-injury release signed by adult injured in health and fitness club held valid and enforceable); *Boucher v. Riner,* 68 Md.App. 539, 514 A.2d 485 (1986) (pre-injury release signed by Naval Academy midshipman injured while skydiving held valid and enforceable); *Winterstein v. Wilcom,* 16 Md.App. 130, 293 A.2d 821 (1972) (pre-injury release signed by adult injured while drag racing on private property held valid and enforceable).

In our quest to find case law that does address this issue, we turn to the appellate courts of other states. When we do, we find that a substantial majority of the state courts that have squarely considered whether a release agreement may bar future negligence claims of a child have held that such agreements are invalid and unenforceable on public policy grounds (the "majority view"). *Galloway v. State,* 790 N.W.2d 252 (Iowa 2010) (holding that parentally executed release, in favor of the state of Iowa, waiving minor child's personal injury claims as a condition of child's participation in educational field trip, violates public policy and is unenforceable); *Kirton v. Fields,* 997 So.2d 349, 350 (Fla.2008) (holding that parent lacks authority to execute, on behalf of minor child, pre-injury release in favor of owners and operators of commercial motor sports park, "when the release involves participation in a commercial activity"); *Hojnowski v. Vans Skate Park,* 187 N.J. 323, 338, 901 A.2d 381 (2006) (holding that "parent's execution of a pre-injury release," in favor of operator of commercial skate park, "of a minor's future tort claims arising out of the use of a commercial recreational facility is unenforceable"); *Cooper v. Aspen Skiing Co.,* 48 P.3d 1229, 1231 (Colo.2002) (holding that pre-injury release and indemnification agreement, signed by both a mother and her seventeen-year-old son, in favor of for-profit skiing club and related entities, "violate[d] Colorado's public policy to protect mi-

nors"), *superseded by statute,* Colo.Rev.Stat. § 13–22–107(3) [8]; *Hawkins v. Peart,* 37 P.3d 1062 (Utah 2001) (holding that parentally executed release, on behalf of minor child, in favor of provider of for-profit trail guide service, containing both waiver of liability and indemnification provision, violates public policy and is unenforceable); *Scott v. Pacific West Mountain Resort, supra,* 119 Wash.2d 484, 492, 834 P.2d 6 (holding that "parent does not have legal authority to waive," in favor of commercial ski school, "a child's own future cause of action for personal injuries resulting from a third party's negligence"); *Meyer v. Naperville Manner, Inc.,* 262 Ill.App.3d 141, 146–47, 199 Ill.Dec. 572, 634 N.E.2d 411 (1994) (holding that, in the absence of statutory or judicial authorization, parent cannot waive, compromise, or release minor child's cause of action, in favor of commercial horse riding stable, "merely because of the parental relationship," although parent could waive his own cause of action arising from his child's injury); *Munoz v. II Jaz, Inc.,* 863 S.W.2d 207, 209–10 (Tex.App.1993) (holding that statute which "grants to the parents of a minor child the power to make decisions of substantial legal significance concerning the child" does not give parents power to waive, in favor of operator of amusement park, child's cause of action for personal injuries because such an interpretation "would be against the public policy to protect minor children"). *See also Woodman v. Kera LLC,* 486 Mich. 228, 785 N.W.2d 1 (2010) (holding that pre-injury waiver of liability, signed by parent on behalf of his or her minor child, in favor of operator of commercial children's play facility, is unenforceable under "longstanding" Michigan common law); *Doyle v. Bowdoin College,* 403 A.2d 1206, 1208 n. 3 (Me.1979) (observing that parent or guardian cannot release "child's, or ward's, cause of action" in favor of private college and directors of summer hockey clinic held at that college); *Childress v. Madison*

---

8. In 2003, the Colorado General Assembly enacted Colo.Rev.Stat. § 13–22–107, abrogating the holding of *Cooper v. Aspen Skiing Company,* 48 P.3d 1229 (Colo.2002). That statute provides that a "parent of a child may, on behalf of the child, release or waive the child's prospective claim for negligence." *Id.* § (3).

*County*, 777 S.W.2d 1 (Tenn.Ct.App.1989) (holding that mother had no authority to release, exculpate or indemnify local government and board of education against liability, on behalf of her twenty-year-old severely retarded son).

Although some state courts, a minority to be sure, have upheld the enforceability of agreements executed by a parent on behalf of a minor child, releasing a potential tortfeasor from future claims of the child (the "minority view"), they have generally done so not where a "commercial enterprise" was the subject of the release, but where the release was of a claim against either a government agency or non-profit organization, or its agents.[9] *Sharon v. City of Newton*, 437 Mass. 99, 769 N.E.2d 738 (2002) (holding that release and indemnification agreement in favor of a municipality, signed by both a father and his sixteen-year-old daughter, as a condition of permitting her to participate in extra-curricular sports, was enforceable); *Zivich v. Mentor Soccer Club, Inc.*, 82 Ohio St.3d 367, 374, 696 N.E.2d 201 (1998) (holding that "parents have the authority to bind their minor children to exculpatory agreements in favor of volunteers and sponsors of nonprofit sport activities where the cause of action sounds in negligence" and that such agreements "may not be disaffirmed by the child on whose behalf they were executed"); *Hohe v. San Diego Unified School District*, 224 Cal.App.3d 1559, 1563, 274 Cal.Rptr. 647 (1990) (holding that releases in favor of a local school district and a parent, teacher, and student association, signed by a father and his fifteen-year-old daughter, as a condition of permitting her to participate in a hypnotism show sponsored by the association, were not "contrary to public policy").[10]

---

**9.** The one minority-view decision, cited by appellee, where a commercial defendant successfully invoked a parentally executed, pre-injury release, did not address either the parents' authority to bind their minor son to the release or whether there was a meaningful distinction between commercial and non-commercial defendants, and thus, we do not find that decision helpful. *Brooks v. Timberline Tours, Inc.*, 941 F.Supp. 959 (D.Colo.1996) (applying Colorado law).

**10.** Although the Court of Appeal of California held that a parentally executed release could bar a minor child from recovery for another's

## A.

Preliminarily, we observe that, while in most of the majority-view decisions noted above, the defendants were commercial entities, there are at least two decisions that have invalidated, on public policy grounds, pre-injury releases, executed by a parent, on behalf of minor children or other legally incompetent persons, where the defendants were governmental agencies: *Galloway v. State*, 790 N.W.2d 252 (release executed by mother, on behalf of minor child, in favor of State of Iowa); *Childress v. Madison County*, 777 S.W.2d 1 (release executed by mother, on behalf of severely retarded adult child, in favor of county and local school board).[11]

The question of whether a different rule should apply to government agencies, non-profit organizations, and their agents, on the one hand, and commercial enterprises, on the other, must await a case involving such an entity, or action by the General Assembly.[12] For our purposes, it is enough to recognize that, in the instant case, BJ's Wholesale is unquestionably a commercial enterprise, and, thus, we need not and do not address whether we would apply the same rule, invalidating a parentally executed pre-injury release on behalf of a minor child, that waives any future claims that child may have, against a governmental entity (or, generally, a non-profit organization), as we apply here to a commercial enterprise.

---

negligence, the appellate court construed the releases in that case as ambiguous and reversed a trial court's grant of summary judgment in favor of the defendants. *Hohe v. San Diego Unified School District*, 224 Cal.App.3d 1559, 1565–68, 274 Cal.Rptr. 647 (1990).

11. In *Doyle v. Bowdoin College*, 403 A.2d 1206 (Me.1979), one of the defendants was Bowdoin College, a private educational institution. In that case, however, the Supreme Judicial Court of Maine interpreted the putative releases as being ambiguous and, hence, unenforceable, *id.* at 1208, and the Maine court stated that it had "no occasion to reach the further issue whether contractual provisions which relieve a party from liability for that party's own negligence would be unenforceable and void as contravening public policy." *Id.* at 1207 n. 2.

12. For a thoughtful discussion of the problems of line-drawing in this area, see the dissenting opinion of Justice Wells in *Kirton v. Fields*, 997 So.2d 349, 363 (Fla.2008).

## B.

The extraterritorial, majority-view decisions [13] that have invalidated, on public policy grounds, pre-injury agreements, executed by a parent on behalf of a minor child, purporting to release a "commercial enterprise," share a number of common features. In each case, a parent had executed, on his or her minor child's behalf, a release agreement (with or without an indemnification clause) in favor of a private commercial enterprise,[14] usually as a pre-condition for allowing the child's access to and participation in some recreational activity. While participating in that activity, the child sustained injuries, and suit was thereafter brought on the child's behalf. In each case, the defendant entity attempted to shield itself from liability by invoking the release agreement, and the trial court granted summary judgment or, as in one case,[15] a motion to dismiss. Thus, all of these cases present the same legal issue and were in essentially the same procedural posture. Consequently, in lieu of a repetitious recitation of the facts, procedural posture, and holding of each of these cases, seriatim, an exercise which would serve to obscure, rather than clarify, we shall, instead, distill the holdings of all of these decisions and the reasoning underlying them.

There are several common threads running through the majority-view decisions, though, admittedly, not all of these threads appear in every one of those decisions. First, the majority-view decisions have generally taken, as a starting point—which, as we shall later explain, we, in Maryland,

---

13. *Kirton v. Fields,* 997 So.2d 349 (Fla.2008); *Hojnowski v. Vans Skate Park,* 187 N.J. 323, 901 A.2d 381 (2006); *Cooper v. Aspen Skiing Co.,* 48 P.3d 1229 (Colo.2002); *Hawkins v. Peart,* 37 P.3d 1062 (Utah 2001); *Scott v. Pacific West Mountain Resort,* 119 Wash.2d 484, 834 P.2d 6 (1992).

14. *Kirton,* 997 So.2d at 356; *Hojnowski,* 187 N.J. at 328–30, 901 A.2d 381; *Cooper v. United States Ski Ass'n,* 32 P.3d 502, 507 (Colo.App. 2000), *rev'd sub nom Cooper v. Aspen Skiing Co.,* 48 P.3d 1229 (Colo. 2002); *Hawkins,* 37 P.3d at 1063; *Scott,* 119 Wash.2d at 487–88, 834 P.2d 6.

15. *Hojnowski,* 187 N.J. at 327, 901 A.2d 381.

cannot—statutes or rules which prohibit a parent from releasing, without court approval, a child's cause of action after an injury has occurred and extended those statutes or rules to the prospective, pre-injury setting. *See, e.g., Hojnowski,* 187 N.J. at 333–34, 901 A.2d 381 (reasoning that, under New Jersey law, "after a minor has suffered a tortious injury, a minor's parent or guardian may not dispose of a minor's existing cause of action without statutory or judicial approval," regardless of whether suit has been filed on the minor's behalf and that, furthermore, "children deserve as much protection from the improvident compromise of their rights before an injury occurs" as afterwards) (citations and quotations omitted); *Cooper,* 48 P.3d at 1233 (observing that the legislature "has demonstrated an on-going commitment to afford minors significant safeguards from harm by passing numerous statutes designed to protect minor children," the "[m]ost significant" of which "are the protections accorded minors in Colorado in the post-injury claim context"); *Hawkins,* 37 P.3d at 1066 (observing that there is no source of law "granting parents in Utah a general unilateral right to compromise or release a child's existing causes of action without court approval or appointment to that effect" and that, as there is "little reason to base the validity of a parent's contractual release of a minor's claim on the timing of an injury," it concluded "that a parent does not have the authority to release a child's claims *before* an injury") (emphasis in original); *Scott,* 119 Wash.2d at 492–94, 834 P.2d 6 (same). *But see Kirton,* 997 So.2d at 354 ("The absence of a statute governing parental pre-injury releases demonstrates that the Legislature has not precluded the enforcement of such releases on behalf of a minor child.").

Second, in declining to enforce such agreements where minors are involved, a number of the majority-view courts have recognized, as the Supreme Court of Utah observed, that an "exculpatory clause that relieves a party from future liability may remove an important incentive to act with reasonable care," that such clauses are "routinely imposed in a unilateral manner without any genuine bargaining or opportunity to pay a fee for insurance," unlike post-injury releases of

liability, which "involve actual negotiations concerning ascertained rights and liabilities," and that, "if anything, the policies relating to restrictions on a parent's right to compromise an existing claim apply with even greater force in the preinjury, exculpatory clause scenario." *Hawkins*, 37 P.3d at 1066. The Supreme Court of New Jersey further observed, moreover, that "at the time a parent decides to release the potential tort claims of his or her child, the parent may not fully understand the consequences of that action and may not have even read the waiver before signing." *Hojnowski*, 187 N.J. at 333, 901 A.2d 381 (citing *Hawkins*, 37 P.3d at 1066).

Third, expounding on the misalignment of incentives that may occur when exculpatory agreements are permitted, a number of majority-view courts have further noted that the owners and operators of commercial businesses are in a better position than minor children to eliminate hazards on their property and to insure themselves against any risks which cannot be eliminated, as the Supreme Court of Florida did in *Kirton v. Fields*, 997 So.2d at 358. There, the Florida court observed that if "pre-injury releases were permitted for commercial establishments, the incentive to take reasonable precautions to protect the safety of minor children would be removed," that a commercial business "can take precautions to ensure the child's safety and insure itself when a minor child is injured while participating in the activity," but that "a minor child cannot insure himself or herself against the risks involved in participating in that activity." *Accord Hojnowski*, 187 N.J. at 335–36, 901 A.2d 381.

Fourth, several of the majority-view decisions have invoked the state's duty to act as *parens patriae*, because, in the words of the New Jersey Supreme Court, although parents "undoubtedly have a fundamental liberty interest" in rearing their children, "the question whether a parent may release a minor's future tort claims implicates wider public policy concerns and the *parens patriae* duty to protect the best interests of children." *Hojnowski*, 187 N.J. at 339, 901 A.2d 381. *See also Kirton*, 997 So.2d at 353 (observing that a parent's right to raise a child is "not absolute and the state as *parens patriae*

may, in certain situations, usurp parental control"); *Cooper*, 48 P.3d at 1235 n. 11 (observing that a parental release on behalf of a minor child is "not of the same character and quality as those rights recognized as implicating . . . parents' fundamental liberty interest in the 'care, custody, and control' of their children" and that, even if such a release "implicates a parent's fundamental right to the care, custody, and control of his child, this right is not absolute") (quoting *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) (O'Connor, J., plurality opinion)).

## C.

We turn now to the instant case. In so doing, we do not begin, as many of the majority-view decisions do, with a statute or rule that requires court approval before a parent may release a minor child's tort claim, after an injury has already occurred. That is because Maryland Code (1974, 2006 Repl.Vol.), section 6–405 of the Courts & Judicial Proceedings Article ("CJ"), provides, in its pertinent portion:

> (a) In general.—Any action, including one in the name of the State, brought by a next friend for the benefit of a minor may be settled by the next friend.

Furthermore, Maryland Rule 2–202(c) provides:

> **Settlement of suits on behalf of minors.** A next friend who files an action for the benefit of a minor may settle the claim in accordance with this subsection. If the next friend is not a parent or person *in loco parentis* of the child, the settlement is not effective unless approved by each living parent or person *in loco parentis*. If (1) both parents are dead and there is no person *in loco parentis* of the child or (2) one of the parents does not approve the settlement, the settlement is not effective unless approved by the court in which the suit is pending. Approval may be granted only on verified application by the next friend, stating the facts of the case and why the settlement is in the best interest of the child.

Consequently, we do not apply the rationale of three of the majority-view decisions—*Scott v. Pacific West Mountain Resort, supra,* 119 Wash.2d 484, 834 P.2d 6; *Cooper v. Aspen Skiing Co., supra,* 48 P.3d 1229; and *Hawkins v. Peart, supra,* 37 P.3d at 1063—since the fulcrum of those decisions was a statute or rule which, contrary to CJ section 6–405 and Rule 2–202, restricts a parent's authority to settle a minor's post-injury claim. *See Scott,* 119 Wash.2d at 494 & nn. 17–18, 834 P.2d 6; *Cooper,* 48 P.3d at 1233 & nn. 9–10; *Hawkins,* 37 P.3d at 1066.[16]

■ Nonetheless, as the Court of Appeals has observed, "The State of Maryland has a *parens patriae* interest in caring for those, such as minors, who cannot care for themselves and the child's welfare is a consideration that is of transcendent importance when the child might ... be in jeopardy." *In re Najasha B.,* 409 Md. 20, 33, 972 A.2d 845 (2009) (quotation omitted). Although this quote is drawn from a child-access case, the important public policy it proclaims is broad and certainly applies here, where adults may be jeopardizing the future welfare of their children by signing releases like the one at issue. It is this *parens patriae* interest which tilts the scales in favor of invalidating a parent's agreement to release his or her child's future tort claims against a "commercial enterprise," even though such an agreement, if executed by the parent on his or her own behalf, may be enforceable. *Wolf v. Ford, supra,* 335 Md. at 531, 644 A.2d 522.

■ Although we are not unmindful of the strong presumption in favor of freedom of contract and the presumption, no less strong, that a parent acts in the best interests of his minor children, we nonetheless adopt the reasoning of *Hojnowski v. Vans Skate Park, supra,* 187 N.J. 323, 901 A.2d 381, and *Kirton v. Fields, supra,* 997 So.2d 349, and hold that a parent may not legally bind his or her minor child to a pre-

---

**16.** *Hojnowski* also relies, in part, upon this rationale, 187 N.J. at 333–34, 901 A.2d 381, but that decision also articulates other grounds, upon which we rely and as we explain *infra.*

injury release of tort liability in favor of a commercial enterprise.

We anticipate that our holding will provide incentives for owners and operators of commercial facilities open to minor children to: (1) take reasonable safety precautions in the operation and maintenance of their facilities; and (2) obtain adequate insurance to cover the risk of physical injury to their minor patrons, caused by the negligence of their employees and agents.

We agree with the New Jersey Supreme Court that, because commercial enterprises "derive economic benefit from" the provision of their services, "they are better able to bear the costs associated with injuries than the children or their families," as they can "spread the costs of insurance among [their] customers." *Hojnowski v. Vans Skate Park, supra,* 187 N.J. at 336, 340, 901 A.2d 381. Moreover, as the *Kirton* Court noted, "a commercial business can take precautions to ensure the child's safety." *Kirton,* 997 So.2d at 357. That is, as the *Hojnowski* Court put it, the "operator of a commercial recreational enterprise can inspect the premises for unsafe conditions, train his or her employees with regard to the facility's proper operation, and regulate the types of activities permitted to occur." *Id.* at 335, 901 A.2d 381. To the extent that some of these considerations apply to releases of liability in favor of commercial businesses, which are enforceable against adults, the critical difference, we note, is that a minor child is far less capable of looking out for his own safety and welfare than an adult, a difference which, in our view, justifies a more protective rule for children. *Kirton,* 997 So.2d at 359–60 (Anstead, J., concurring).

## II.

BJ's Wholesale contends that the issue, concerning the enforceability of the indemnification clause, is unpreserved for appellate review, as it "was mentioned only tangentially in the court below," was "not the basis for BJ's motion for summary judgment," and was, according to BJ's Wholesale, neither

relied upon nor considered by the trial court in rendering its decision. It further claims that the indemnification clause is not rendered invalid by any public policy consideration and that it is unambiguous and enforceable.

■ We disagree. We believe that issue has been preserved for our review. BJ's quoted the release agreement, including its language regarding indemnification, both in its motion for summary judgment and in its reply memorandum below. Moreover, during the hearing before the circuit court, in its opening statement, BJ's stated that the Rosens "also agreed to defend, indemnify and hold BJ's harmless for any claim that the child brought against BJ's." Finally, the Rosens' opposition to BJ's motion for summary judgment stated that "[e]nforcing this waiver and indemnification clause would violate Maryland's generally recognized deeply-rooted public policy interest in protecting the best interests of children." Thus, the enforceability of the indemnification clause was clearly raised before the court below. Under Maryland Rule 8–131(a), that is all that is required to preserve an issue for appellate review.

■ Even if the issue were not expressly advanced below, it is, we conclude, "inextricably intertwined" with the enforceability of the exculpatory clause, an issue the circuit court did address. As the Supreme Court of Utah observed, an indemnification clause, by shifting financial responsibility for a minor child's injury from a tortfeasor to the child's parent, "allow[s] negligent parties to circumvent" the "rule voiding waivers signed on behalf of a minor." *Hawkins v. Peart, supra,* 37 P.3d at 1067. Although an indemnification clause "theoretically" binds only the parent who signed it, "as a practical matter, it could chill," that court observed, a child's pursuit of his own claims against a negligent party, as his parent "would be the ultimate source of compensation." *Id.* at 1067–68.

■ Moreover, in *Conaway v. Deane,* 401 Md. 219, 243–44, 932 A.2d 571 (2007), the Court of Appeals observed that "if two or more similar and 'inextricably intertwined' grounds for summary judgment exist," an appellate court "may consider

alternatively any related ground, if raised properly by the litigant in his, her, or its motion for summary judgment, if we find fault with the ground relied upon facially by the trial court." Thus, although, ordinarily, we "will consider only the grounds upon which the [trial] court relied in granting summary judgment," *Eid v. Duke,* 373 Md. 2, 10, 816 A.2d 844 (2003) (quotation omitted), the instant case falls within the exception to that rule, as described in *Conaway,* 401 Md. at 243–44, 932 A.2d 571. Accordingly, we shall address whether the indemnification clause is enforceable.

We begin by construing the indemnification clause, which, unlike the exculpatory clause, does not refer exclusively to negligence. That provision states:

> I further agree to indemnify, defend and hold harmless BJ's Wholesale Club, Inc., its subsidiaries and affiliates and their respective agents, employees, officers, directors, successors and assigns *from any claims or causes of action of any kind arising from my or my child's use of the Play Center.*

(Emphasis added.)

Because this language does not expressly indemnify for negligence, the Rosens claim that it is not "sufficiently explicit" to be enforceable, relying on *Adloo v. H.T. Brown Real Estate, Inc., supra,* 344 Md. 254, 686 A.2d 298. But that decision also stated that, in Maryland, an exculpatory (or indemnification) clause "need not contain or use the word 'negligence' or any other 'magic words,'" but, rather, "is sufficient . . . 'as long as [its] language . . . clearly and specifically indicates the intent to release the defendant from liability for personal injury caused by the defendant's negligence.'" *Id.* at 266, 686 A.2d 298 (quoting *Barnes v. New Hampshire Karting Ass'n,* 128 N.H. 102, 509 A.2d 151, 154 (1986)).

The indemnification clause follows the exculpatory clause, which states that the parent "individually and on behalf of [his] child, [does] hereby waive, release and forever discharge BJ's . . . from any and all claims and causes of action of any kind or nature which are in any way related, directly or

indirectly, to the use of Play Center which [he] may have or that hereafter may accrue including any such claims or causes of action caused in whole or in part by the negligence of BJ's." In contrast to the exculpatory clause, the indemnification clause appears to express BJ's intent to be indemnified "from any claims or causes of action of any kind arising from [the parent's or the] child's use of the Play Center." It thus shields BJ's from liability in any case arising from a child's use of the play center, whether sounding in negligence or not. When viewed in context, the indemnification clause is not limited to BJ's negligence, and, contrary to the Rosens' assertion, the indemnification clause is not ambiguous and does not "consist[ ] of general release language," and *Adloo* does not, necessarily, bar its enforceability.

 Instead, we are confronted with an indemnification clause that, facially, overreaches. Because "a party will not be permitted to excuse its liability for intentional harms or for the more extreme forms of negligence, i.e., reckless, wanton, or gross," the indemnification clause, despite its express terms, cannot indemnify BJ's against its own heightened culpability. *Wolf, supra,* 335 Md. at 531, 644 A.2d 522. Subject to this limitation, however, the indemnification clause unambiguously seeks to require the signatory parent to indemnify BJ's from its negligent acts arising from use of the play center. We thus consider whether this clause, so construed, is enforceable.

 For the same public policy reasons relied upon in holding the exculpatory clause unenforceable against Ephraim, we hold that the indemnification clause is unenforceable against his parents. As previously noted, "[w]ere the rule otherwise, it would circumvent the rule regarding exculpatory clauses and the policy of affording protection in the law to the rights of those who are unable effectively to protect those rights themselves." *Childress v. Madison County, supra,* 777 S.W.2d at 7. "As a practical matter, release and indemnity provisions in contracts signed by parents or guardians on behalf of their minor children go hand-in-hand: having invali-

dated release provisions, it would be contradictory to then effectively undercut a minor's rights to sue by allowing indemnity clauses that make such suits for all realistic purposes unlikely." *Cooper, supra,* 48 P.3d at 1237.

▆▆▆ Indeed, indemnification clauses in contracts executed by parents on behalf of their minor children create an unacceptable conflict of interest between a parent and child. *Hawkins,* 37 P.3d at 1067. As the Court of Appeals of New York observed in *Valdimer v. Mt. Vernon Hebrew Camps, Inc.,* 9 N.Y.2d 21, 25, 210 N.Y.S.2d 520, 172 N.E.2d 283 (1961):

> A fortiori, we are extremely wary of a transaction that puts parent and child at cross-purposes and, in the main, normally tends to quiet the legitimate complaint of the minor child. Generally, we may regard the parent's contract of indemnity, however well-intended, as an instrument that motivates him to discourage the proper prosecution of the infant's claim, if that contract be legal. The end result is either the outright thwarting of our protective policy or, should the infant ultimately elect to ignore the settlement and to press his claim, disharmony within the family unit. Whatever the outcome, the policy of the State suffers.

We agree.

JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY REVERSED. CASE REMANDED FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEES.